UNITED STATES DISTRICT COURT

FOR THE

EASTERN DISTRICT OF VIRGINIA

RICHMOND DIVISION


```
* * * * * * * * * * * * * *
UNITED STATES OF AMERICA,    * CRIMINAL NO. 3:23-CR-00079
                             * JULY 14, 2023  2:22 P.M.
             Plaintiff,      * ARRAIGNMENT & DETENTION HEARING
                             * VOLUME I OF I
vs.                          *
                             *
XAVIER LOPEZ,                * Before:
                             * HONORABLE MARK R. COLOMBELL
             Defendant.      * UNITED STATES MAGISTRATE JUDGE
* * * * * * * * * * * * * *  * EASTERN DISTRICT OF VIRGINIA
```

APPEARANCES:

For the Plaintiff:        THOMAS A. GARNETT, ESQUIRE
                          PETER S. DUFFEY, ESQUIRE
                          United States Attorney's Office
                          SunTrust Building
                          919 East Main Street
                          Suite 1900
                          Richmond, VA 23219

For the Defendant:        FREDERICK M. SCHICK, ESQUIRE
                          Schick & Schick PC
                          9512 Iron Bridge Road
                          Suite 102
                          Chesterfield, VA 23832

FTR Operator:             Jessica Saunders


Court Reporter:           Melissa H. Custis, RPR
                          701 East Broad Street
                          Richmond, Virginia 23219
                          (804)916-2278


        Proceedings recorded by electronic recording.
Transcript produced by computer.

U.S.A. v. Lopez – 7/14/2023

| | |
|---|---|
| 1 | **<u>WITNESS INDEX</u>** |
| 2 | GOVERNMENT'S WITNESSES:                                PAGE NO. |
| 3 | **<u>Robert Wright:</u>** |
| 4 | Direct by Mr. Garnett                                  11 |
| 5 | Cross by Mr. Schick                                    46 |
| 6 | |
| 7 | |
| 8 | |
| 9 | **<u>EXHIBIT INDEX</u>** |
| 10 | **GOVERNMENT'S EXHIBITS:**            **MARKED**        **RECEIVED** |
| 11 | 1                                                      21 |
| 12 | 2                                                      28 |
| 13 | 3                                                      29 |
| 14 | 4                                                      31 |
| 15 | 5                                                      33 |
| 16 | 6                                                      43 |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

U.S.A. v. Lopez - 7/14/2023

 1          (Court convened at 2:22 p.m.)

 2          THE CLERK:  The Honorable Mark R. Colombell, United

 3  States Magistrate Judge, presiding.

 4          This court is now in session.  Please be seated and

 5  come to order.

 6          THE COURT:  Good afternoon.

 7          MR. GARNETT:  Good afternoon, Your Honor.

 8          MR. SCHICK:  Good afternoon, Your Honor.

 9          THE COURT:  Madam Clerk, will you please call our

10  next matter.

11          THE CLERK:  Case Number 3:23-CR-79, *United States of*

12  *America versus Xavier Lopez.*

13          The United States is represented by Thomas Garnett

14  and Peter Duffey.

15          The defendant is represented by Frederick Schick.

16          Are counsel ready to proceed?

17          MR. GARNETT:  The United States is ready, Your Honor.

18          MR. SCHICK:  Defense is ready, Your Honor.

19          THE COURT:  Thank you both, gentlemen.

20          Mr. Garnett, good afternoon, sir.

21          MR. GARNETT:  Good afternoon, Your Honor.

22          Judge, we're here for a detention hearing and an

23  arraignment.  I'm happy to take those in whichever order Your

24  Honor would prefer.

25          THE COURT:  If we could put the type of hearing --

U.S.A. v. Lopez - 7/14/2023

1  well, you put the type of hearing on the record.  If we could

2  put on the penalties once again, then the Court will

3  provide -- and the speedy trial calculation, then the Court

4  will provide the Rule 5(f) notice.

5          MR. GARNETT:  Yes, Your Honor.  One moment, please.

6          Your Honor, in terms of the charges the defendant is

7  facing, it's a two-count indictment.  Count One charges

8  possession of ammunition by a convicted felon, in violation of

9  18, United States Code, Section 922(g)(1).  The maximum

10  penalties for that offense are a term of up to 15 years

11  incarceration, a fine of up to $250,000, up to three years

12  supervised release, and a $100 special assessment.

13          Count Two charges possession of a destructive device,

14  in violation of Title 26, United States Code, Sections 5841,

15  5845, and 5861(c),(d), and (f).  That charge carries a maximum

16  possible penalty of ten years incarceration, a fine of up to

17  $10,000, up to three years supervised release, and a $100

18  special assessment.

19          And, Your Honor, in terms of the speedy trial

20  cutoff --

21          MR. DUFFEY:  I have September 19th.

22          MR. GARNETT:  We calculate it as September 19th,

23  Your Honor.  I have not actually consulted with Mr. Schick as

24  to that date.  I understood we would be having a conference

25  call with Judge Novak that would have -- would render that

U.S.A. v. Lopez - 7/14/2023

1  somewhat moot in terms of the next 70 days.

2          THE COURT:  Yes, sir.  Yes, sir.  Understood.  Thank

3  you.

4          Pursuant to Rule 5(f), the United States is ordered

5  to produce all exculpatory evidence to the defendant pursuant

6  to *Brady v. Maryland* and its progeny.  Not doing so in a

7  timely manner may result in serious consequences.  This could

8  include but is not limited to the potential exclusion of

9  evidence, dismissal of charges, and other sanctions which can

10  be imposed by the Court.

11          Thank you, Mr. Garnett.

12          MR. GARNETT:  Yes, sir.

13          THE COURT:  Mr. Schick, good afternoon, sir.  It's

14  good to see you again.

15          MR. SCHICK:  Good to see you, Judge.

16          THE COURT:  Mr. Schick, if you could approach the

17  podium with Mr. Lopez.  What we'll do is we'll take up the

18  arraignment first, and then I'll have you return to counsel

19  table for some scheduling matters, and then we'll pick up the

20  detention hearing.

21          Good afternoon, Mr. Lopez.  Sir, you are here for

22  your arraignment and for a detention hearing.  We're going to

23  take up the arraignment first.  And so for the arraignment,

24  for purposes of the arraignment only, I'm going to ask the

25  clerk of court to place you under oath at this time, okay?

U.S.A. v. Lopez - 7/14/2023

1          THE CLERK:  Sir, please raise your right hand.

2      (The defendant is sworn.)

3          THE COURT:  Good afternoon, sir.  Can you please

4  state your full name?

5          THE DEFENDANT:  Xavier Louis Lopez.

6          THE COURT:  Mr. Lopez, how old are you?

7          THE DEFENDANT:  23.

8          THE COURT:  And how far did you go in school, sir?

9          THE DEFENDANT:  I have graduated high school with a

10  diploma, and I have been certified in a couple of courses.

11          THE COURT:  So you've taken some college-level

12  courses after high school?

13          THE DEFENDANT:  Well, certification courses, I would

14  say.

15          THE COURT:  Okay.  Sir, can you read, write, and

16  understand the English language?

17          THE DEFENDANT:  Yes.

18          THE COURT:  Are you under the influence of any drugs

19  or alcohol here today?

20          THE DEFENDANT:  No.

21          THE COURT:  Are you under the treatment of any doctor

22  for any mental health illness?

23          THE DEFENDANT:  No.

24          THE COURT:  Have you received a copy of the

25  indictment in this matter, sir?

U.S.A. v. Lopez - 7/14/2023

1    THE DEFENDANT:  Yes.  Although, I have not been
2    allowed to keep it from when I was -- when I was placed in
3    Pamunkey jail, I was -- I have not yet been given a copy to
4    keep in my -- on my property at hand.  It was just kept in my
5    property with my -- with my suite clothes.
6    THE COURT:  Ms. Saunders, could you print him a copy
7    of the indictment?
8    THE CLERK:  Yes.
9    THE COURT:  So, Mr. Schick, what we're going to do is
10   we're going to print another copy of the indictment for
11   Mr. Lopez, just so he has a physical copy with him here at the
12   hearing, okay?
13   MR. SCHICK:  Yes, sir, Judge.  We have one here as
14   well.
15   THE COURT:  Oh, you have a copy.
16   Do you have a copy there, Mr. Lopez?
17   THE DEFENDANT:  Yes.
18   THE COURT:  Okay.  Ms. Saunders, I think we're okay.
19   Sir, have you reviewed the indictment with your
20   attorney, Mr. Schick?
21   THE DEFENDANT:  Yes.
22   THE COURT:  Do you understand the charges against
23   you, sir?
24   THE DEFENDANT:  Yes.
25   THE COURT:  Do you understand the maximum penalties

U.S.A. v. Lopez - 7/14/2023

1  that may apply?

2          THE DEFENDANT:  Yes.

3          THE COURT:  Mr. Lopez, do you understand all the

4  questions that I have asked of you this afternoon?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Mr. Schick, do you agree with the speedy

7  trial calculation of September the 19th?

8          MR. SCHICK:  Yes, sir, Judge.

9          THE COURT:  And have you had a sufficient opportunity

10  to review the indictment with Mr. Lopez prior to appearing

11  before me today?

12          MR. SCHICK:  Yes, Your Honor.

13          THE COURT:  And does Mr. Lopez wish that the

14  indictment be read to him or does he waive formal reading of

15  the indictment?

16          MR. SCHICK:  We'll waive the reading, Judge.

17          THE COURT:  Madam Clerk, at this time would you

18  please arraign Mr. Lopez.

19          THE CLERK:  Xavier Lopez, you understand the charges

20  against you in the indictment.  I ask you now:  How do you

21  plead as to Counts One and Two, guilty or not guilty?

22          THE DEFENDANT:  Not guilty.

23          THE CLERK:  And do you request a trial by the Court

24  or by jury?

25          THE DEFENDANT:  Jury.

U.S.A. v. Lopez - 7/14/2023

1          THE CLERK:  Thank you.

2          THE COURT:  Thank you.

3          Mr. Schick, at this time I'll ask you to return to

4    counsel table with Mr. Lopez.  We'll take up some scheduling

5    matters, and then I'll ask the parties about the detention

6    hearing and what evidence each side intends to introduce.

7          MR. SCHICK:  Yes, sir.

8          THE COURT:  Counsel, as you are both aware, instead

9    of selecting a trial date at the arraignment handled by a

10   magistrate judge, Judge Novak requests that a conference call

11   be scheduled with him.  At the conference call attended by the

12   attorneys, Judge Novak will set a trial date and other

13   deadlines discussed with the attorneys.

14         Have we identified a date and time for that

15   conference call with Judge Novak, Ms. Saunders?

16         THE CLERK:  Yes, Judge, July 20th at 3:30.

17         THE COURT:  July 20th at 3:30.

18         Since Judge Novak will take up the trial date,

19   scheduling, and motions at that time, the Court will not put

20   any motions deadlines on the record at this time.

21         Mr. Lopez, the next hearing in this matter is a

22   status conference with just the attorneys on July the 20th,

23   2023, at 3:30 p.m.  After that conference call, Mr. Schick

24   will be in contact with you regarding the deadlines and any

25   other dates or hearings scheduled in this matter.  Do you

U.S.A. v. Lopez – 7/14/2023

1  understand, sir?

2          THE DEFENDANT:  Yes.

3          THE COURT:  So, Counsel, now that we've taken up the

4  arraignment, let's turn our attention to the detention

5  hearing.

6          Let me confirm first with both counsel, we do not --

7  with regards to the two charges, a presumption of detention

8  does not apply to either charge, correct, Mr. Garnett?

9          MR. GARNETT:  That's correct, Your Honor.

10         THE COURT:  You would agree, Mr. Schick, of course?

11         MR. SCHICK:  Yes, sir, Judge.

12         THE COURT:  Okay.  So it would be the government's

13  burden by clear and convincing evidence as to danger to the

14  community and by a preponderance of the evidence regarding

15  flight risk.

16         Mr. Garnett, what evidence does the defendant -- does

17  the government intend to introduce, if any, here today?

18         MR. GARNETT:  Your Honor, we would call a special

19  agent from the FBI.

20         THE COURT:  Okay.  And, Mr. Schick, do you have

21  evidence -- do you have any live testimony you intend to call

22  here today?

23         MR. SCHICK:  Judge, the only evidence that I foresee

24  we may have is the third-party custodian is here present, so

25  we may have some questions for her.

```
 1              THE COURT:  That's Mr. Lopez's aunt, so you may be

 2   calling his aunt.  Okay.

 3              MR. SCHICK:  That's correct, Judge.

 4              THE COURT:  So, Mr. Garnett, go ahead and call your

 5   first witness, sir.

 6              MR. GARNETT:  Thank you, Your Honor.

 7              Your Honor, the United States would call Special

 8   Agent Rob Wright with the FBI.

 9              THE COURT:  Agent Wright, please come forward, sir.

10              MR. GARNETT:  Your Honor, I'll note there's an

11   exhibit binder up there in front of you, sir.

12              THE COURT:  Thank you, Mr. Garnett.

13              MR. GARNETT:  Yes, Your Honor.

14              THE COURT:  Mr. Schick, do you have a copy of the

15   exhibits from the government?

16              MR. SCHICK:  I do, yes, sir, Judge.

17              THE CLERK:  Sir, please raise your right hand.

18         ROBERT WRIGHT, GOVERNMENT'S WITNESS, AFFIRMED

19                      DIRECT EXAMINATION

20              THE COURT:  Yes, sir.

21   BY MR. GARNETT:

22   Q    Good afternoon, Agent Wright.  Could you please state

23   your name for the record and spell it?

24   A    My name is Robert Wright, R-O-B-E-R-T, W-R-I-G-H-T.

25   Q    And how are you employed, Agent Wright?
```

Wright - Direct

```
1  A    I'm employed by the Richmond FBI Office as a special

2  agent.

3  Q    How long have you been there?

4  A    I've been there for almost 12 years.

5  Q    Have you been involved in an investigation into an

6  individual named Xavier Lopez regarding firearms and

7  explosives possession?

8  A    Yes, sir.

9  Q    To be fair, are you the lead agent in that investigation,

10 Agent Wright?

11 A    I am not.

12 Q    Is your testimony today, then, based in part on reports

13 and conversations you've had with other individuals and

14 agencies?

15 A    It is.

16 Q    So I mentioned earlier Xavier Lopez.  Are you familiar

17 with an individual named Xavier Lopez?

18 A    Yes, I am.

19 Q    Do you recognize him here today?

20 A    I do.

21 Q    Where do you see him?

22 A    He's sitting here in the blue jumpsuit.

23      MR. GARNETT:  Your Honor, if the record could reflect

24 that the agent has identified Xavier Lopez.

25      THE COURT:  Yes.
```

1  BY MR. GARNETT:

2  Q    Do you know where Xavier Lopez, the defendant, was

3  residing in August of 2020, Agent Wright?

4  A    Yes.  1419 Fort Hill Drive in Henrico.

5  Q    And speaking very generally for the Court, how would you

6  describe that location?

7  A    It's a single-family home, single level.

8  Q    Was the defendant staying there by himself or with anyone

9  else?

10 A    He lived there with his aunt.

11 Q    Do you know that individual's name?

12 A    Her name is Bernadette Haxhaj.

13 Q    Do you know if there's anyone else -- to your knowledge,

14 is there anyone else in the residence?

15 A    Not to my knowledge.

16 Q    And the time frame we're speaking of, Agent Wright, is,

17 essentially, August 2020 to the present.  So during that time

18 frame, is it fair to say it was just the defendant and

19 Ms. Haxhaj in that residence?

20 A    Yes, sir.

21 Q    At some point in August 2020, was the defendant arrested

22 by the Henrico County Police Department?

23 A    Yes, he was.

24 Q    Do you know the reason for that arrest?

25 A    He was involved in a vandalism of a vehicle in the

Wright - Direct

1   neighborhood.

2   Q    Do you know exactly how the defendant was accused of

3   vandalizing that vehicle?

4   A    He was accused of slashing the tires on the vehicle.

5   Q    Was the defendant carrying anything else besides -- well,

6   I should ask, was the defendant carrying a knife at that time?

7   A    I believe so, yes, sir.

8   Q    Was he carrying anything else, to your knowledge?

9   A    He was carrying what's generally referred to as a Bonnie

10  Blue flag.

11  Q    Are you familiar with any associations with that

12  particular flag?

13  A    Yes.  It's generally associated with the Confederacy.

14  Q    Did onlookers to this vandalism incident call the police?

15  A    They did.

16  Q    Did Henrico County Police place the defendant into

17  custody?

18  A    Yes, sir.

19  Q    Have you been able to review, Agent Wright, at least some

20  of the body camera video of the arrest and the defendant's

21  transport to state custody?

22  A    I have.

23  Q    During his transport, did the defendant assault the

24  police officer who was transporting him?

25  A    Yes, sir, he did.

Wright - Direct

1  Q     Could you describe that incident briefly for the Court?

2  A     While he was being transported by Henrico PD, he reached

3  for and obtained control of a knife that was in the center

4  console of the police cruiser.  The officer directed him

5  numerous times to put the knife down and subsequently tried to

6  remove Mr. Lopez from the car, at which time he assaulted the

7  officer.

8  Q     Was the defendant subsequently charged with both felony

9  vandalism and assault on law enforcement?

10  A     Yes, sir.

11  Q     On January 7th of 2021, did the defendant plead guilty

12  in Henrico County Circuit Court to the charge of felony

13  vandalism?

14  A     He did.

15  Q     Relatively clear-cut, but from that point forward, Agent

16  Wright, was the defendant a convicted felon?

17  A     Yes, sir.

18  Q     At that point forward or from that point forward, was he

19  legally prohibited from possessing any kind of firearm?

20  A     He was.

21  Q     Legally prohibited from possessing any kind of

22  ammunition?

23  A     Yes.

24  Q     What sentence did Mr. Lopez, the defendant, receive in

25  Henrico County Circuit Court?

Wright - Direct

1  A    I believe it was five years with four suspended.

2  Q    As a result of the defendant's plea agreement and later

3  conviction in Henrico County, was the defendant required to

4  turn over all firearms, firearm parts, and ammunition to the

5  Henrico County Police Department?

6  A    Yes, sir.

7  Q    Did a family member of the defendant's turn over those

8  materials or related materials in December of 2020?

9  A    Yes, his aunt.

10 Q    Before we touch on that inventory, Agent Wright, just

11 some general questions.  What is an AR-15 rifle?

12 A    An AR-15 is an assault rifle based on a Colt pattern, and

13 it's widely available and used in the civilian sector.

14 Q    Are there ways that individuals can build their own

15 AR-15-type rifles as opposed to purchasing them from a

16 firearms dealer?

17 A    Yes, sir.

18 Q    Before we get there, what is a lower receiver, Agent

19 Wright?

20 A    A lower receiver on an assault rifle is basically where

21 the magazine well is, the trigger assembly, and usually the

22 buttstock.

23 Q    If an individual is purchasing a lower receiver from a

24 manufacturer, is that lower receiver fully completed?

25 A    No.

Wright - Direct

1  Q    Is another word for an unfinished lower receiver an

2  80 percent lower?

3  A    Yes, sir.

4  Q    To convert an 80 percent lower into a functioning lower

5  receiver for use in an AR-15 or similar type assault rifle,

6  would the individual purchasing that 80 percent lower need to

7  drill holes in certain locations?

8  A    Yes, sir.

9  Q    To drill those holes, would an individual typically use

10  what's known as a jig kit?

11  A    He would.

12  Q    What's a jig kit, Agent Wright?

13  A    A jig kit is basically a kit that contains a pattern.  It

14  allows someone to know where those holes need to be drilled on

15  that unfinished receiver.

16  Q    To drill those holes, would someone need a device like a

17  drill press?

18  A    Yes.

19  Q    What's an upper receiver, Agent Wright?

20  A    An upper receiver is generally considered to be the

21  barrel and the chamber.  That's the top of the weapon.

22  Q    So we spoke earlier about the collection and turnover in

23  December of 2020 of a number of items by the defendant's

24  family member to the Henrico County Police Department.  Are

25  you familiar with the materials that were turned over?

Wright - Direct

```
 1  A    Yes, sir.
 2  Q    Did those materials include more than 1,000 rounds of
 3  5.56 ammunition?
 4  A    They did.
 5  Q    What kind of rifle shoots 5.56?  Or I should be more
 6  specific.  Does an AR-15-type rifle shoot 5.56-millimeter
 7  ammunition?
 8  A    Generally, yes, sir.
 9  Q    Did the defendant's family member also turn over 15
10  AR-style magazines with 30-round capacities?
11  A    Yes.
12  Q    Two 40-round AR-style magazines?
13  A    Yes.
14  Q    Four AR-15 80 percent lower receivers?
15  A    Yes.
16  Q    Three complete AR-style upper receivers?
17  A    Correct.
18  Q    One jig kit for AR-15 80 percent lower receivers?
19  A    Yes, sir.
20  Q    Four AR-style trigger/handle kits?
21  A    Yes.
22  Q    And four AR-style stocks?
23  A    Correct.
24  Q    At the time of the defendant's arrest in 2020 by the
25  Henrico County Police Department, Agent Wright, is it fair to
```

Wright - Direct

1  say the defendant had a functional firearms manufacturing

2  setup at the 1419 Fort Hill Drive residence?

3  A    I would say so.

4  Q    Agent Wright, you mentioned that the defendant was

5  sentenced to a term of 12 months incarceration.  Did he

6  complete that term on June 28th of 2021?

7  A    Yes, sir.

8  Q    Where did he go upon his release?

9  A    He returned to his residence at Fort Hill Drive.

10 Q    Was the defendant's aunt still residing there at that

11 point?

12 A    Yes, sir.

13 Q    In the weeks and months following the defendant's release

14 and return to Fort Hill Drive, did law enforcement observe the

15 defendant travel to at least three stores with firearm

16 sections?

17 A    Yes, sir.

18 Q    How did the defendant travel to these locations?

19 A    His aunt took him.

20 Q    Specifically, the defendant -- did the defendant travel

21 to a Field & Stream store located in Charlottesville,

22 Virginia, on July 4th, 2021?

23 A    Yes, sir.

24 Q    Did the defendant's aunt drive him there?

25 A    She did.

Wright - Direct

1  Q    Is this approximately a week after the defendant's

2  release from state prison?

3  A    Yes.

4  Q    Approximately how far is it from 1419 Fort Hill Drive to

5  the Field & Stream store in Charlottesville?

6  A    Approximately one hour.

7  Q    Approximately how many miles, Agent Wright, speaking

8  generally?

9  A    I would say between 60 and 70 miles.

10  Q    Have you reviewed surveillance footage of the defendant's

11  visit to the store on that date?

12  A    Yes, I have.

13  Q    There's a binder there in front of you, Agent Wright.  If

14  you could take a look at that.

15       Take a look at Government's Exhibit 1, Agent Wright.

16  A    Yes.

17  Q    There's a number of images contained in Government's

18  Exhibit 1.  Could you just flip through those quickly and let

19  me know when you're done.

20  A    Okay, sir.

21  Q    Have you previously reviewed Government's Exhibit 1 as

22  well?

23  A    Yes, I have.

24  Q    What do you recognize Government's Exhibit 1 to be?

25  A    It is a visit to the store by Mr. Lopez and his aunt.

Wright - Direct

1    Q    Are these surveillance -- or stills lifted from

2    surveillance footage from this store?

3    A    Yes, they're all from the store surveillance cameras.

4         MR. GARNETT:  Your Honor, I would move to enter

5    Government's Exhibit 1.

6         THE COURT:  Mr. Schick, any --

7         MR. SCHICK:  No objection, Your Honor.

8         THE COURT:  Thank you.

9         MR. GARNETT:  All right.

10        THE COURT:  Those will be received and admitted into

11   evidence as Government's Exhibit 1.

12        (Government's Exhibit Number 1 was received.)

13   BY MR. GARNETT:

14   Q    So, Agent Wright, looking at the first page --

15        MR. GARNETT:  Thank you, Your Honor.

16   BY MR. GARNETT:

17   Q    Looking at the first page of Government's Exhibit 1

18   there, what does that surveillance image capture?

19   A    It's a picture of Mr. Lopez walking toward the entrance

20   of the store.

21   Q    Take a look at page 2.  What does that capture?

22   A    That is a picture of his aunt walking toward the entrance

23   to the store.

24   Q    Where in that store did the defendant travel to upon

25   entry?

Wright - Direct

1  A    The next screenshot is in the gun purchasing area, the

2  gun counter area.

3  Q    Are we looking at the third picture in that display

4  there, Agent Wright?

5  A    Yes, sir.

6  Q    Are there rifles available for sale there at that

7  Field & Stream?

8  A    There are.

9  Q    Are there pistols available for sale at that

10 Field & Stream?

11 A    Yes, sir.  Uh-huh.

12 Q    Take a look at the next page.  Another image capturing

13 the defendant browsing the firearm section?

14 A    Correct.

15 Q    Next image, another photograph?

16 A    Correct.

17 Q    I won't belabor the point, but the next two pages, they

18 also capture instances of the defendant looking at firearms?

19 A    Yes, sir.

20 Q    Is the defendant's aunt present with him in the firearms

21 section at this time?

22 A    She is.

23 Q    Let's take a look at the last page there, Agent Wright.

24 What does that image capture?

25 A    It is Mr. Lopez and his aunt leaving the store, crossing

Wright - Direct

1   into the parking lot.

2   Q    Did the defendant's aunt also drive him to a Wal-Mart in

3   December of 2021?

4   A    Yes, sir.

5   Q    To your knowledge, did the defendant travel to the

6   firearms section of that store on that day?

7   A    He did.  He went to the sporting goods area.

8   Q    Did the defendant's aunt also take him to a Cabela's on

9   that same day in December of 2021?

10  A    Yes, sir.

11  Q    Did the defendant also travel to the firearms section of

12  that sporting goods store?

13  A    He did.

14  Q    Did the defendant tell a clerk at one of those stores

15  that he, that is the defendant, wanted to build a .308 caliber

16  rifle with an 11 and a half inch barrel?

17  A    Yes, sir.

18  Q    Did the defendant also tell the clerk that he -- again,

19  the defendant -- wanted to find 168 grain Winchester .308

20  ammunition to use with that rifle?

21  A    He did.

22  Q    Upon the defendant's release and return to that Fort Hill

23  Drive residence, did investigators attempt to learn whether

24  the defendant was active online?

25  A    They did.  Yes, sir.

Wright - Direct

1   Q    Did investigators determine whether that Fort Hill Drive

2   residence had internet access?

3   A    They did.

4   Q    What internet service provider provided service to that

5   residence?

6   A    Comcast.

7   Q    Did Comcast maintain the same IP address for that

8   residence between 2019 and 2022?

9   A    Yes, sir.

10  Q    Were investigators able to trace that IP address to

11  several social media accounts?

12  A    They were.

13  Q    Were several of those accounts registered under alias

14  names --

15  A    Yes, sir.

16  Q    -- that is names other than the defendant's?

17  A    Yes, they were.

18  Q    Was one of those alias accounts on the social media

19  platform Gab?

20  A    It was.

21  Q    What was the account name?

22  A    I believe it was Cru54d3r.

23  Q    Have you reviewed some of the postings made by that

24  account, Cru54d3r, on Gab?

25  A    Yes, sir.

Wright - Direct

1  Q    And were those postings -- I would just say, did those

2  postings express certain views as to certain minorities?

3  A    Yes, they did.

4  Q    Certain religious groups?

5  A    Yes, they did.

6  Q    Take a look at Government's Exhibit 2, Agent Wright.

7        THE COURT:  Mr. Garnett, just for clarification of

8  the record, were all the photographs in the binder admitted

9  collectively as Government's Exhibit 1, correct, or is the

10 whole binder being --

11       MR. GARNETT:  No, I'm sorry, Your Honor.  Just

12 Government's Exhibit 1 consisted of an eight-page --

13       THE COURT:  The eight photographs you're showing?

14       MR. GARNETT:  Yes, sir.

15       THE COURT:  That's your understanding as well,

16 Mr. Schick?

17       MR. SCHICK:  Yes, sir.

18       THE COURT:  Okay.  Thank you.

19       MR. GARNETT:  Looking at Government's Exhibit 2 now,

20 Your Honor.

21 BY MR. GARNETT:

22 Q    Agent Wright, are you familiar with Government's Exhibit

23 2?

24 A    Yes, sir.

25 Q    What is Government's Exhibit 2?

Wright - Direct

1   A    It is a screenshot of a posting from the Gab account in

2   question.

3   Q    And what is the date of this posting?

4   A    September 1st, 2022.

5   Q    And there's a number of highlightings on this posting.

6   To be clear, Agent Wright, were those highlightings made by

7   law enforcement as opposed to the poster?

8   A    Yes, sir.

9         MR. GARNETT:  Your Honor, I would move for the

10  admission of Government's Exhibit 2.

11        THE COURT:  Mr. Schick, any objection?

12        MR. SCHICK:  Judge, I would object to the foundation

13  unless it has already been laid as to tying this particular

14  account to Mr. Lopez.  I haven't heard that.  Perhaps I just

15  didn't catch it.

16        MR. GARNETT:  Your Honor, I believe the agent

17  testified that a certain IP address was assigned to the

18  residence.  That IP address was utilized to access several

19  social media accounts.  One of which was this Gab account.

20        THE COURT:  That is my recollection, but if you want

21  to revisit that issue very briefly, Mr. Garnett, to

22  reestablish the connection there.  But my connection was he

23  also testified regarding the IP address.  But, Mr. Garnett,

24  could you revisit that with the agent, please?

25        MR. GARNETT:  Yes, sir.

Wright - Direct

```
 1  BY MR. GARNETT:

 2  Q    Did the Cru54d3r Gab account, was that account accessed

 3  using the IP address assigned to the 1419 Fort Hill Drive

 4  residence by Comcast?

 5  A    Yes, sir.

 6         THE COURT:  With that evidence, the Court will

 7  overrule the objection.

 8  BY MR. GARNETT:

 9  Q    Agent Wright, looking at this posting, does the poster,

10  Cru54d3r, express their views as to Jewish people?

11  A    Yes, sir.

12  Q    What about black people?

13  A    Yes, sir.

14  Q    What does the poster say looking about halfway down the

15  page there, Agent Wright, as to what the poster's followers

16  should do if they see police officers come to their residence?

17  A    "Have no tolerance for cops.  If they come to your house,

18  that's your cue to shoot them.  If you see cops at your white

19  neighbor's house, that's also your cue to shoot them.  If you

20  hear of cops beating up a white man in your area, get together

21  to attack the whole police department."

22  Q    What does the poster say as to how much respect the

23  poster has for laws, looking at the last posting there, the

24  last highlighted portion?

25  A    "Have absolutely zero regard for the, quote, 'law and
```

Wright - Direct

1    order,' unquote, of the kike system that hates you."

2    Q    Did this Gab account poster also provide advice to his

3    followers as to how to manufacture firearms?

4    A    Yes, sir.

5    Q    Take a look at Government's Exhibit 3.

6         THE COURT:  Mr. Garnett --

7         MR. GARNETT:  Yes, sir.

8         THE COURT:  -- I think -- did you actually move for

9    the admission of 2?  I guess I overruled the objection.

10        MR. GARNETT:  Yes, sir, I did.  But I would move

11   again, Your Honor.

12        THE COURT:  Mr. Schick has noted an objection, which

13   the Court has overruled, so Exhibit 2 will be received and

14   admitted into evidence as Government's Exhibit 2 over the

15   objection of Mr. Schick.

16       (Government's Exhibit Number 2 was received.)

17        THE COURT:  Thank you, please proceed, Mr. Garnett.

18        MR. GARNETT:  Yes, sir.

19   BY MR. GARNETT:

20   Q    Agent Wright, are you familiar with Government's Exhibit

21   3?

22   A    Yes, sir.

23   Q    Are these additional postings by the Cru54d3r Gab

24   account?

25   A    Yes, they are.

Wright - Direct

1        MR. GARNETT:  Your Honor, I would move for the

2   admission of Government's Exhibit 3.

3        THE COURT:  Same objection, Mr. Schick?

4        MR. SCHICK:  Yes, sir, Judge.

5        THE COURT:  Okay.  The objection will be overruled.

6   What's been identified as Government's Exhibit 3 will be

7   received and admitted into evidence, marked as Government's

8   Exhibit 3 over the objection of the defendant.

9        (Government's Exhibit Number 3 was received.)

10  BY MR. GARNETT:

11  Q    Agent Wright, taking a look at Government's Exhibit 3

12  there, what is the poster -- he's offering some helpful tips

13  to, quote, "How to have a proper organization without opening

14  yourself up to glownigger entrapment schemes, end quote."

15  What does the poster tell his followers they should do?

16  A    The poster writes, "All real weapons should be built, not

17  bought.  This can be done with a 3D printer and a parts kit,

18  both of which can quite easily be bought untraceably."

19  Q    And looking at this -- it's not highlighted, but what

20  does the poster say about tactics that individuals can use to

21  avoid law enforcement detection?  Please keep reading that

22  sentence.

23  A    Yes, sir.  "Especially if everyone in the group holds

24  mail for each other, and any debit cards used are purchased

25  with cash and are registered under a pseudonym when

Wright - Direct

1  necessary."

2  Q    That's fine.  Thank you, Agent Wright.

3       Looking at the second posting there, Agent Wright.  Can

4  you read -- I should say, does the poster discuss whether or

5  not being a convicted felon is a good reason not to carry a

6  firearm?

7  A    Yes, sir.

8  Q    Can you read that post for the Court?

9  A    The post reads:  "No, being a convicted felon is not at

10 all a valid excuse for remaining unarmed.  Stay strapped or

11 get clapped.  If you don't have a gun yet, at least acquire

12 the means to make one.  Parts kits are everywhere and 3D

13 printers are pretty cheap."

14 Q    And, Agent Wright, there's dates -- the first posting --

15       MR. GARNETT:  Excuse me, Your Honor.

16 BY MR. GARNETT:

17 Q    The first posting is October 7th, the 7th is -- the

18 second is October 5th.  What years were these postings made?

19 A    That would be 2022.

20 Q    Excuse me.  Take a look at Government's Exhibit 4, Agent

21 Wright.  Are you familiar with Government's Exhibit 4?

22 A    Yes, sir.

23 Q    What is Government's Exhibit 4?

24 A    It's another screenshot of a posting on the Gab account

25 we discussed previously.

Wright - Direct

1   Q    What's the date of this posting?

2   A    October 4th, 2022.

3        MR. GARNETT:  Your Honor, I would move for the

4   admission of Government's Exhibit 4.

5        THE COURT:  Same objection, Mr. Schick?

6        MR. SCHICK:  Yes, sir, Judge.

7        THE COURT:  The Court will overrule the objection and

8   receive this document into evidence as Government's Exhibit 4.

9        (Government's Exhibit Number 4 was received.)

10  BY MR. GARNETT:

11  Q    Could you go ahead and read the first full sentence --

12  I'm sorry, the first two sentences of that posting, Agent

13  Wright?

14  A    "This is why we should always be armed.  Raid a military

15  or police armory if you have to.  Go full Lord of War but for

16  white people only, if necessary.  Manufacture pipe bombs using

17  match heads or mix acetone and either 35 percent peroxide or

18  styrofoam."

19  Q    Did investigators learn during the course of their

20  investigation as to whether or not the defendant was making

21  online purchases?

22  A    They did.

23  Q    To make those purchases, was the defendant utilizing

24  aliases?

25  A    Yes, sir.

Wright - Direct

1  Q    During this time frame, 2021, 2022, do you understand the

2  defendant to have any kind of gainful employment?

3  A    I am not aware of any, no, sir.

4  Q    Specifically, did investigators learn that the defendant

5  purchased online burglary tools?

6  A    They did.

7  Q    Did they learn whether he purchased a 9-millimeter

8  handgun build kit?

9  A    They did.

10  Q    Okay.  Have you reviewed a number of the records related

11  to those online transactions?

12  A    Yes, sir.

13  Q    Was the cost associated with just three of those

14  transactions cumulatively more than $600?

15  A    They were.

16  Q    Where did the defendant direct these online purchases to

17  be shipped to?

18  A    1419 Fort Hill Drive.

19  Q    Did Henrico County Police Department obtain a search

20  warrant for the defendant's residence in November of 2022?

21  A    Yes, sir.

22  Q    Did they execute that search warrant on November 13th

23  of 2022?

24  A    They did.

25  Q    As part of that search warrant execution, did

Wright - Direct

 1  investigators take various photographs of the interior and

 2  exterior of that residence?

 3  A    Yes, sir.

 4  Q    Have you reviewed a number of those search warrant

 5  photographs?

 6  A    I have.

 7  Q    Take a look at Government's Exhibit 5, Agent Wright.

 8  Have you previously reviewed Government's Exhibit 5?

 9  A    Yes, sir.

10  Q    What are the images in Government's Exhibit 5?

11  A    They are photographs from the exterior, interior, and

12  premises of 1419 Fort Hill Drive.

13  Q    And were those photographs taken during the execution of

14  the search warrant on November 13th, 2022?

15  A    Yes, sir.

16       MR. GARNETT:  Your Honor, I would move for the

17  admission of Government's Exhibit 5.

18       THE COURT:  Mr. Schick, any objection?

19       MR. SCHICK:  No objection, Your Honor.

20       THE COURT:  All right.  The photographs will be

21  admitted -- received and admitted into evidence as

22  Government's Exhibit 5.

23    (Government's Exhibit Number 5 was received.)

24       MR. GARNETT:  Thank you, Your Honor.

25  BY MR. GARNETT:

Wright - Direct

1   Q    Agent Wright, you mentioned that you've had the

2   opportunity to become familiar with 1419 Fort Hill Drive in

3   the course of this investigation.  Do you recognize the

4   residence depicted there on the first image?

5   A    Yes, sir.

6   Q    And what is that?

7   A    It is 1419 Fort Hill Drive.  It's a street view of the

8   house.

9   Q    Okay.  We're going to take a quick walk through of these

10  photographs, Agent Wright.  Turn to page 2.  Is there a small

11  shed in the backyard of that residence?

12  A    Yes, sir.

13  Q    Is that a photograph of that shed?

14  A    It is.

15  Q    Turning to page 3.  What does this image depict, Agent

16  Wright?

17  A    This is the interior of the shed.

18  Q    Looking at the interior of the shed there, Agent Wright,

19  do you see a shelf on the right-hand side of the image?

20  A    Yes, sir.

21  Q    And do you see two bottles there on the left-hand side or

22  the two furthest left objects on that shelf?

23  A    I do.

24  Q    Have you previously reviewed those devices or looked at

25  those devices?

Wright - Direct

```
 1   A     Yes, I have.

 2   Q     Can you describe those devices for the Court?

 3   A     They are what appear to be bottles with cloth wicks

 4   coming out of the top of them, and they're filled with liquid.

 5   Q     In your training and experience, Agent Wright, when you

 6   observed those bottles, did they resemble anything to you?

 7   A     Yes.  I would assume that they are some sort of Molotov

 8   cocktail-type device.

 9   Q     What's a Molotov cocktail?

10   A     A Molotov cocktail is a container that's filled with an

11   incendiary liquid, and it is designed to have a wick on it so

12   that when the container is thrown and it busts or opens, the

13   flammable material inside basically explodes and burns

14   whatever it's in contact with.

15   Q     Were these items collected and later provided to the FBI

16   laboratory in Quantico?

17   A     Yes, sir.

18   Q     Did the FBI lab determine these devices contained both

19   gasoline and polystyrene?

20   A     They did.

21   Q     What is polystyrene, Agent Wright?

22   A     Polystyrene is a foam-type substance that would have been

23   added to probably thicken a liquid and act as a jelly-type

24   material that would adhere to objects that were within the

25   explosive area.
```

Wright - Direct

1   Q     Is polystyrene a kind of styrofoam then?

2   A     Yes, sir.

3   Q     And you mentioned -- I think you said flaming jelly; is

4   that right?

5   A     Yes.  Basically, yes.

6   Q     Would the mixture function essentially as a kind of

7   napalm?

8   A     Yes, sir.

9   Q     Probably an obvious question, would adding styrofoam to a

10  Molotov cocktail's gasoline mixture make that device more

11  lethal?

12  A     I would say so, yes, sir.

13  Q     Let's go back inside the residence here, Agent Wright,

14  looking at the fourth image.  What's the vantage point of this

15  fourth image from which this photograph was taken?

16  A     This is a photo from the hallway of Mr. Lopez's bedroom.

17  Q     And do you see the object hanging there on the wall?

18  A     I do.

19  Q     What do you recognize that to be?

20  A     I would refer to it as a Nazi banner with a swastika.

21  Q     Take a look at the next image.  Did investigators locate

22  a blue book bag within that bedroom?

23  A     They did.

24  Q     I should take a step back.  Do you understand that

25  bedroom to have been the defendant's bedroom?

Wright - Direct

1   A     Yes, sir.

2   Q     Did investigators look inside that blue book bag?

3   A     They did.

4   Q     Let's turn to the next image.  Did investigators locate a

5   box of ammunition within that book bag?

6   A     Yes, they did.

7   Q     Is that a photograph of that box of ammunition?

8   A     Yes, it is.

9   Q     Turn to the next page.  Is that another picture of the

10  same box just taken for evidence collection purposes?

11  A     It is.

12  Q     What caliber ammunition is that Hornady Critical Defense

13  box of ammunition?

14  A     I know it to be a 9-millimeter caliber from a sister

15  photo.

16  Q     Take a look at the next image.  Did investigators also

17  locate a number of devices within that blue book bag?

18  A     Yes, sir.

19  Q     Is this one of those devices?

20  A     It is.

21  Q     What is affixed to the bottom right-hand side of that

22  bottle, Agent Wright?

23  A     It appears to be an all weather or extreme weather match

24  or hurricane-type match.

25  Q     And is a hurricane match, does the flame that it burns

Wright - Direct

1  with, does it resemble the kind of sparkler that a child might

2  wave around on the 4th of July?

3  A    Yes, sir.

4  Q    Is it designed to withstand high winds?

5  A    It is.

6  Q    Exposure to water?

7  A    Correct.

8  Q    Take a look at the next image.  Is this a photograph of

9  the devices located within the book bag found in the

10  defendant's bedroom?

11  A    Yes, sir.

12  Q    In your training and experience, Agent Wright, what do

13  you recognize these to be?

14  A    I would believe that they were improvised incendiary kind

15  of devices, sir.

16  Q    Were these devices collected and provided to the FBI

17  laboratory in Quantico?

18  A    Yes, they were.

19  Q    Did the FBI laboratory confirm that these devices

20  contained both gasoline and polystyrene as well?

21  A    They did.

22  Q    Regarding that FBI lab analysis, Agent Wright, as to each

23  of the eight devices we've talked about here today, did the

24  FBI laboratory conclude that each of those devices was either

25  a fully assembled or partially assembled improvised incendiary

 1  device?

 2  A     Yes, sir.

 3  Q     Did the FBI lab search those devices for DNA?

 4  A     They did.

 5  Q     Did they recover the defendant's DNA from six of those

 6  devices?

 7  A     Yes, sir.

 8  Q     Did they also inspect those devices for latent

 9  fingerprints?

10  A     They did.

11  Q     Did they recover the defendant's fingerprints from three

12  of those devices?

13  A     They did.

14  Q     Let's go back into the residence, Agent Wright, and turn

15  to the next photo.  What room of the house is this photo taken

16  in?

17  A     This is still Mr. Lopez's bedroom.

18  Q     Do you recognize the device contained there on the desk?

19  A     It appears to be a 3D printer.

20  Q     Did agents find 3D printed material, Agent Wright, within

21  the defendant's bedroom?

22  A     Yes, they did.

23  Q     Let's turn to the next page.  Did agents -- or

24  investigators, I should say, did they recover this 3D print

25  attempt from the defendant's bedroom?

Wright - Direct

1  A     Yes, sir.

2  Q     What do you recognize that an attempt to be or an attempt

3  to print?

4  A     They appear to be an attempt at a lower receiver for a

5  handgun.

6  Q     Looking at the next image, Agent Wright, is that the same

7  handgun attempt just taken for evidence collection purposes?

8  A     They are.

9  Q     And then the next image, is that just the reverse side of

10 the handgun grip?

11 A     That's correct.

12 Q     Looking at the last image, Agent Wright, what is that?

13 A     This is what I would call a slide that belongs to the

14 upper receiver of a handgun.

15 Q     Was that slide to a handgun part of the 9-millimeter

16 build kit purchased?

17 A     It was.

18 Q     By the defendant?

19 A     Yes, sir.

20 Q     Was the defendant arrested by state authorities following

21 the execution of the search warrant, Agent Wright?

22 A     He was.

23 Q     At some point thereafter, did federal agents interview

24 the defendant at Henrico County Jail?

25 A     Yes, they did.

Wright - Direct

1  Q    During that interview, did the defendant deny possessing

2  the 9-millimeter ammunition found in the book bag?

3  A    No.

4  Q    Did the defendant deny knowledge of the Molotov

5  cocktails?

6  A    No.

7  Q    Did the defendant respond to a question about those

8  devices by claiming that he had those devices because he was

9  interested in their historical significance?

10 A    That's my understanding, yes, sir.

11 Q    Did investigators also speak with the defendant on

12 November 13th, 2022, during the execution of the state

13 search warrant?

14 A    Yes.

15 Q    During the interview, did they ask him for officer safety

16 purposes whether the devices that they had located were at

17 least somewhat stable, that is, would they explode at any

18 time?

19 A    Yes, sir.

20 Q    Did the defendant tell the investigators that they were

21 not designed to just explode?

22 A    He did.

23 Q    Did the defendant indicate to investigators during that

24 interview approximately how long he had been in possession of

25 those devices?

Wright - Direct

1   A     I believe he stated months.

2   Q     During the search warrant execution on November 13th,

3   did investigators search the entire residence?

4   A     Yes, sir.

5   Q     Did they search a bedroom belonging to the defendant's

6   aunt, Bernadette Haxhaj?

7   A     They did.

8   Q     During that search of that bedroom, did they recover a

9   letter from the nightstand?

10  A     Yes, sir.

11  Q     Was that letter contained in a mailing envelope?

12  A     It was.

13  Q     According to the mailing envelope, who is the drafter of

14  that letter?

15  A     Xavier Lopez.

16  Q     Take a look at Government's Exhibit 6, Agent Wright.

17  Have you previously reviewed Government's Exhibit 6?

18  A     Yes, sir.

19  Q     And what is Government's Exhibit 6?

20  A     It is an envelope and the letter contained within from

21  Mr. Lopez at the Henrico County Jail.

22  Q     Is this a letter that was recovered from Ms. Haxhaj's

23  bedroom nightstand?

24  A     Yes.

25        MR. GARNETT:  Your Honor, I would move for the

1  admission of Government's Exhibit 6.

2       MR. SCHICK:  No objection, Your Honor.

3       THE COURT:  The letter identified will be received

4  and admitted into evidence as Government's Exhibit 6.

5       (Government's Exhibit Number 6 was received.)

6  BY MR. GARNETT:

7  Q    And looking at the return address on this envelope, Agent

8  Wright, who's the sender?

9  A    Xavier Lopez.

10 Q    What's the address provided by Xavier Lopez?

11 A    Henrico County Jail East.

12 Q    And what is the date of mailing, looking just to the left

13 of the stamp?

14 A    28 May 2021.

15 Q    To your knowledge, Agent Wright, was the defendant, in

16 fact, incarcerated at Henrico Jail East during that time?

17 A    He was.

18 Q    Is 28 May 2021 approximately one month before the

19 defendant's release?

20 A    Yes, sir.

21 Q    If we could look at page 2 or I should say the first page

22 of the letter.  To be clear, Agent Wright, are the highlighted

23 portions of the letter, were the highlightings found in the

24 letter or were they added by law enforcement later?

25 A    They were added later by law enforcement.

Wright - Direct

1   Q    Could you read the first highlighted portion for the

2   Court?  Actually, I'm going to take a step back.  Who's the

3   letter addressed to, the very top?

4   A    It is addressed --

5   Q    Oh, I'm sorry.  The first page of the letter, Agent

6   Wright.

7   A    Yes, sir.  It's addressed to Bernadette Haxhaj.

8   Q    Thank you.

9        And then looking at the letter itself, the first page,

10  who is the -- who's the letter addressed to at the top of that

11  first page?

12  A    Dear Bernadette.

13  Q    Could you read the first highlighted portion for the

14  Court?

15  A    "Our government is evil.  Enough so that there can be no

16  peaceful coexistence between God's plan and following the

17  law."

18  Q    Can you read the second highlighted portion?

19  A    "You say that you'll always have a place for me in your

20  home, but when you also said no guns were allowed, I knew that

21  to be a lie.  Ultimately, you did allow me to have the rifle."

22  Q    And the next highlighted portion.

23  A    "The reason I will not be caught dead without a gun is

24  the same reason our Lord said, quote, 'If you don't yet have a

25  sword, sell your cloak and buy one,' closed quote."

1  Q    Agent Wright, as of the date this letter was mailed to

2  Bernadette Haxhaj, was the defendant a convicted felon?

3  A    Yes, sir.

4  Q    Turn to page 2.  Can you read the bottom highlighted

5  portion beginning with "it must"?

6  A    "It must be said that unless I am able to build guns,

7  explosives, and other forms of weaponry and store them in my

8  room without fear of the law finding out about it from you, I

9  cannot fully trust in anything you say or do."

10 Q    Turn to the next page.  And looking at the very bottom

11 portion here, can you start out reading that sentence, and

12 then we'll turn to the next page?

13 A    "All that needs to be done is for us to truly unite in

14 Christ Jesus and make total war against the Satanic occultist

15 government and the Zionist devil worshiping bankers who

16 control it, and the Lord God will give us victory."

17 Q    And looking at the bottom of the page, sort of the

18 laundry list of human beings.  Can you read off the next

19 quotation?

20 A    "Jews, liberals, communists, degenerates, Zionists,

21 progressives, capitalists, globalists, and Green Party

22 PETA-type environmentalists are the greatest enemies of God

23 and the primary representatives of the devil himself in the

24 spotlight and everyday life.  Learn to spot them and how to

25 destroy them."

Wright - Cross

1  Q    And turn to the last page, Agent Wright.  How does the

2  defendant sign this letter?

3  A    Xavier Lopez, 21st century crusader.

4         MR. GARNETT:  Thank you, Agent Wright.  That's all

5  the questions I have.  Please answer any questions that

6  defense counsel or the Court may have for you.

7         THE COURT:  Cross-examination, Mr. Schick.

8         MR. SCHICK:  Yes, sir, Judge.

9                    CROSS-EXAMINATION

10 BY MR. SCHICK:

11 Q    Agent Wright, after my client was found guilty of the

12 Henrico County destruction of property, law enforcement

13 reached out to his family for them to turn over certain items,

14 correct?

15 A    Yes, sir.

16 Q    And they, in fact, turned over those items as directed,

17 correct?

18 A    That's correct.

19 Q    All right.  And that was my client's aunt who

20 participated in that; is that right?

21 A    Yes, sir.

22 Q    All right.  And then you referenced an event as far as an

23 allegation of assault on a police officer.  My client was not

24 found guilty of that conduct, correct?

25 A    My understanding is, as part of his plea deal, he -- they

Wright - Cross

1    dropped that charge.

2    Q     It was dropped?

3    A     Yes, sir.

4    Q     Yes, sir.

5    A     That's correct.

6    Q     And then the shopping trips that you've referenced here

7    and testified to as to Field & Stream, nothing was purchased

8    at that particular store, correct?

9    A     Not to my knowledge, no, sir.

10   Q     And Field & Stream carries a number of items, not just

11   firearms and hunting gear, but also camping and sleeping bags

12   and all sorts of items, correct?

13   A     That's correct, sir.

14   Q     The same applies to Wal-Mart, correct?  Nothing was

15   purchased at the Wal-Mart?

16   A     Not to my knowledge, no, sir.

17   Q     And Cabela's, the same situation, nothing was purchased

18   there; is that right?

19   A     That's correct, to my knowledge.

20   Q     And I apologize if this is a simplistic question, but how

21   exactly do you determine those particular posts on social

22   media were written by this gentleman?  I understand you've

23   testified as to the IP address --

24   A     Yes, sir.

25   Q     -- but can you expand on that?

Wright - Cross

1  A    We knew from earlier in the investigation that he had

2  used Gab before, so --

3  Q    When you say "Gab," what do you mean Gab?

4  A    The platform that was referenced in those screenshots.

5  Q    That's a platform used by a number of individuals; is

6  that correct?

7  A    I assume so, yes, sir.

8  Q    Okay.

9  A    Yeah.  And that particular account was tied to the IP

10  address that was associated with 1419 Fort Hill Drive.

11  Q    Very well.  Very well.

12      And the 3D printer that you have put forth photos of

13  today, that was -- allegedly created these two pieces of

14  plastic that were there in the shape of a firearm; is that

15  correct?

16  A    That was the belief, yes, sir.

17  Q    All right.  And the testimony that you've given about

18  these kits and tools and things of that sort, do you have any

19  specifics as to whether those were purchased before my client

20  was found guilty in Henrico County, or do you have that

21  information?

22  A    The kits on the original search warrants, sir, that we

23  talked about, or the ones that we talked about with the

24  exhibits?

25  Q    You've laid so much out here today.

U.S.A. v. Lopez - 7/14/2023

1   A     Right.

2   Q     It's quite a bit to try to parse through.  Do you have

3   the dates or do you not have the dates of the purchase?

4   A     I believe the dates are on the purchase receipts for

5   those items.  I don't have them in front of me.

6   Q     Very well.

7   A     Yes, sir.

8   Q     Were they before his conviction or not, or do you just

9   not know?

10  A     I'm not clear.  I believe they were after, but I'm not

11  clear.

12  Q     You're not sure?

13  A     Yes, sir.

14  Q     All right.  Very well.

15        MR. SCHICK:  I don't have anything else, Judge.

16  Thank you, sir.

17        THE COURT:  Any redirect?

18        MR. GARNETT:  No redirect, Your Honor.

19        THE COURT:  Agent Wright, thank you for being here

20  today, sir.  You can return to your seat at this time.

21        THE WITNESS:  Thank you, Your Honor.

22        THE COURT:  Does the government have any additional

23  evidence to present?

24        MR. GARNETT:  No, sir, just argument.

25        THE COURT:  Okay.  Mr. Schick, does the defense have

U.S.A. v. Lopez - 7/14/2023

1  any evidence to present by way of testimony or proffer here

2  today?

3          MR. SCHICK:  Judge, I would prefer to go by proffer,

4  because everything that I would ask my client's aunt is

5  already laid out in the pretrial report, unless the government

6  has some objection.

7          THE COURT:  Any objection to a proffer, Mr. Garnett?

8          MR. GARNETT:  No, sir.  That's fine.

9          THE COURT:  Mr. Schick, you can proceed with your

10 proffer.

11         MR. SCHICK:  Yes, sir, Judge.

12         Essentially, Judge, what we're asking the Court to

13 consider is to have my client's aunt serve as a third-party

14 custodian.  As laid out in the pretrial services report, she

15 lives here locally in Henrico County.  His aunt works for the

16 SCC here in Richmond.  She works remotely three days a week,

17 so would be home in the household most of the time.  She also

18 shared with the pretrial services worker that she has some

19 ability to expand upon that, may be able to work remotely even

20 more than just the three days.

21         As to my client and his background and things of that

22 sort, what we would proffer, he's 23 years of age.  As laid

23 out in the pretrial report, he has a job opportunity where his

24 aunt has been in contact with a local tree cutting service

25 where they may have some employment opportunities, as well as

U.S.A. v. Lopez - 7/14/2023

1    the city of Richmond.  There may be an employment opportunity

2    there as well.

3            As far as my client's prior record, you've heard

4    about it essentially through the testimony today.  You have

5    the destruction of property in Henrico County.  There was one

6    other matter that was initially assault and reduced to

7    trespass, then dismissed, is the way I read the pretrial

8    report.  Most importantly, there's no failures to appear of

9    any kind.  My client has significant ties here to this

10   community.  He's lived here since 2018, has significant family

11   support here with his aunt, who's here in support of him

12   today.  We would suggest to the Court that he is not a flight

13   risk due to his lack of failures to appear and his ties to

14   this community.

15           As to whether he is a danger to the community, I

16   understand that that may be more of what we're really here

17   about.  We would suggest to the Court that he has no history

18   of any violence as far as his criminal record.  As to the

19   evidence put forth in the binder today and the testimony of

20   the agent, there's quite a bit of rhetoric put out there, but

21   as far as actual conduct by my client, we would suggest to you

22   that there's not conduct of violence.  There's certainly

23   alleged conduct of inflammatory statements made on chat sites

24   or internet sites, things of that nature.

25           We would ask Your Honor to consider releasing my

U.S.A. v. Lopez – 7/14/2023

1  client on some very strict pretrial conditions, perhaps home

2  electronic monitoring or something of that nature while this

3  matter is set for trial.

4          THE COURT:  Thank you, Mr. Schick.

5          Mr. Garnett.

6          I know Mr. Schick's proffer and argument kind of

7  overlapped a little.  Mr. Schick, I'll certainly provide you

8  an opportunity to address anything Mr. Garnett may raise by

9  way of argument.

10         MR. SCHICK:  Thank you, Judge.

11         THE COURT:  Yes, sir.

12         MR. GARNETT:  Thank you, Your Honor.

13         Your Honor, obviously as Your Honor knows, it's the

14  government's burden to establish there's no condition or a

15  combination of conditions that can secure the defendant's

16  return to court, that is his appearance back before Judge

17  Novak and the safety or the safety of the community.  Your

18  Honor, I'd submit that the evidence that was submitted here

19  today establishes overwhelmingly that no condition or

20  combination of conditions can satisfy either of those two

21  considerations.

22         Judge, looking first at the third-party custodian,

23  I'll note that pretrial services did not find her to be a

24  suitable custodian.  Judge, I would wholeheartedly concur with

25  that assessment.

U.S.A. v. Lopez - 7/14/2023

1          Looking first at the proposed plan submitted, it's

2   not feasible, Your Honor.  The defendant would presumably work

3   as a tree cutter, which is one of the most mobile professions

4   out there.  He would be going to different spots on a daily

5   basis.  It would require the defendant to change, again, daily

6   work locations.  The defendant's aunt would need to wholesale

7   shift her employment from what I understand to be -- I don't

8   want to misquote -- three days a week at work, and then two

9   days a week hybrid.  She would need to be there with the

10  defendant every moment of every day, Your Honor.  I don't see

11  any representation that the State Corporation Commission is

12  inclined to provide her that kind of leeway.

13         But looking more concretely, Judge, at the

14  defendant's proposed third-party custodian, starting off in

15  the most benign fashion, Judge, she's a likely government

16  witness by virtue of the fact that we're talking about a very

17  small dwelling place occupied by two people, and the charges

18  against the defendant deal with possession of various

19  materials.  So confirming that the other person in the

20  residence was not, in fact, in possession of those materials,

21  and was not the actual owner of those materials is obviously

22  going to be something that would come up at trial or could

23  come up at trial.

24         But more to the point, Judge, the defendant's aunt

25  has been just shy of an aider and abettor throughout this

U.S.A. v. Lopez - 7/14/2023

1  investigation.  Within a week of his release, she drove him

2  more than 60 miles to a Field & Stream store in

3  Charlottesville, where they went directly to the firearms

4  counter.  I can't think of any reasonable reason, Judge, to

5  take your just released felon nephew to a firearm store and

6  allow him to salivate over pistols and rifles for some time.

7        Judge, looking at the other items that have come

8  before the Court, the charged conduct in this offense took

9  place within the confines of a small residence occupied by the

10 defendant and his aunt.  In other words, Judge, the defendant

11 possessed eight destructive devices.  He may well have built

12 them there.  He possessed ammunition.  All of this took place

13 under the presumably watchful eye of the defendant's aunt

14 before.  That all happened before.  Returning him to the same

15 location that he used to possess ammunition and destructive

16 devices is just not a feasible solution, Your Honor.

17        The aunt, the defendant's aunt, Judge, knew about his

18 violent ideological views, or at least his ideological views,

19 because there was a Nazi flag hanging on the wall of the

20 bedroom facing the hallway doorway, which the defendant's aunt

21 would presumably have to walk by on a regular basis.  The

22 defendant's aunt knew about his desire to acquire weapons,

23 Judge.  She knew about his desire to -- I don't want to

24 misquote the defendant here -- she knew that, quote, "It must

25 be said that unless I am able to build guns, explosives, and

U.S.A. v. Lopez - 7/14/2023

1  other forms of weaponry and store them in my room without fear

2  of the law finding out about it from you, I cannot fully trust

3  in anything you say or do."

4       Judge, the defendant was charged with building

5  explosives and storing weaponry and ammunition and those

6  explosives in his bedroom.  He told his aunt what he was going

7  to do a month before he was released from prison, and then he

8  did it, Your Honor.  And the defendant's aunt did not notify

9  law enforcement that her nephew had a minor firearms and

10 explosives factory in his bedroom.

11      Judge, there's no way the Court can have any kind of

12 confidence the defendant's aunt is going to be a conscience

13 and wholly involved third-party custodian.  So I'd submit that

14 I agree with pretrial services' recommendation that she is

15 not, in fact, a suitable custodian.

16      Turning then, Your Honor, to the defendant himself

17 and looking at the detention factors that are enumerated in

18 18, United States Code, Section 3142.  The first of those,

19 Judge, directs the Court to consider the nature and

20 circumstances of the offense charged.  And the statute

21 specifically directs the Court to consider whether the offense

22 charged includes the possession or the use of a destructive

23 device, which is precisely what the defendant is, in fact,

24 charged with in Count Two of the indictment.  The defendant

25 possessed eight incendiary devices, Your Honor.  They were

U.S.A. v. Lopez - 7/14/2023

1  devices that contained both gasoline and polystyrene, which

2  makes those devices more lethal, not that a Molotov cocktail

3  is a good thing, but adding styrofoam to it makes it even

4  worse.  There's no good reason, Judge, to possess and store

5  Molotov cocktails.  It's not a form of art.  It's not hanging

6  a Monet.  They're destructive devices and they're treated as

7  such by U.S. Code.

8       Looking at the weight -- I should actually take note,

9  Judge, that I don't want to lose track of Count One.  It's a

10  serious offense as well.  I think it's worth noting, Judge,

11  that the ammunition the defendant possessed matched the

12  caliber of handgun kit that he had purchased, and that he was

13  trying to print a 3D lower receiver to match that receiver

14  kit.  In other words, Judge, the defendant had one part of the

15  puzzle that he would need to hurt people, and he was busy

16  assembling the others.

17       Looking at the weight of the evidence, Judge, factor

18  (g)(2), I know there are many courts that have said that we're

19  not to consider that as one of the most important factors, but

20  the weight of the evidence here against the defendant, Your

21  Honor, is overwhelming.  The devices were found in a shed on

22  his property and in his bedroom.  His DNA was found on a

23  number of those, his fingerprints were found on a number of

24  those, and he admitted to possessing those devices.

25       Looking at the defendant's history and

U.S.A. v. Lopez - 7/14/2023

1   characteristics, factor (g)(3), the defendant has a mental

2   health history, Judge, that includes at least one suicide

3   attempt.  He is unemployed.  And I'll draw, Your Honor, this

4   maybe ropes back a little bit to the third-party custodian

5   question, the defendant was unemployed during this time frame,

6   yet was able to make online purchases totaling more than $600,

7   including purchases of an online -- or an online purchase of a

8   firearm kit.  But more to the point here, Judge, for (g)(3),

9   he was unemployed, he is unemployed, and he is entirely

10  financially relying on his aunt according to the pretrial

11  services report.

12        Finally, Judge, looking at his criminal history, it

13  is brief.  I would submit it's also violent.  It involved the

14  use of a knife to slash the tires on a neighbor's vehicle and

15  assault on a police officer.  I understand that he was not

16  convicted of that offense.  However, Agent Wright testified

17  that he watched body cam video that clearly depicted that

18  assault.

19        Finally, Judge, I think most importantly here, the

20  fourth factor the Court is to consider in weighing detention,

21  whether detention is appropriate, is the nature and

22  seriousness of the danger to the community the defendant's

23  release would pose.  Judge, the defendant possessed eight

24  incendiary devices.  They have only one purpose.  He is a

25  convicted felon who possessed ammunition that matched the kind

U.S.A. v. Lopez - 7/14/2023

1  of firearm he was trying to build.  We do not have to

2  speculate as to why he built destructive devices.  We do not

3  have to speculate as to why he possessed ammunition, Judge,

4  because the defendant has explained that to us in a letter he

5  sent to his aunt and in postings that he made on that Gab

6  account, Judge.  He described a lengthy list of people that he

7  wanted to destroy.  It probably includes most of the people in

8  this courtroom, Judge, by far in one category or the other.

9  He described to his followers on that Gab account, he

10 explained to his followers how to build untraceable guns, how

11 to assemble pipe bombs.  He described how to assemble the

12 parts, how to acquire the parts needed for firearms.  He

13 explained how to acquire those parts while avoiding law

14 enforcement detection.

15         Judge, the defendant is explicit about how he feels

16 about the law, that it's not that he just doesn't respect it,

17 Your Honor, he thinks that disobeying it, that flouting it is

18 a noble and necessary thing to do in this ideological pursuit

19 that only he can probably elaborate on for the Court.

20         So, Your Honor, I'd submit that there's overwhelming

21 evidence that there is no condition or combination of

22 conditions that can ensure the defendant's appearance or the

23 safety of the community, and we, therefore, ask that he be

24 detained pending trial.

25         THE COURT:  Thank you, Mr. Garnett.

U.S.A. v. Lopez - 7/14/2023

1              Mr. Schick.

2              MR. SCHICK:  Judge, I'll be brief.  I'll rely

3    primarily on my earlier statements and comments.  The only

4    thing I would say is I believe the government's assertion that

5    this is some sort of manufacturing facility over at this

6    residence in Henrico County is not consistent with the

7    evidence that you have before you.  You have pictures of six

8    to eight soda bottle or juice bottles where apparently an

9    individual poured gasoline.  And so to assert that his aunt

10   knows that there's some sort of factoring going on over there,

11   it's just not consistent with what we have before us.  So to

12   make those kind of assertions or allegations, I would suggest

13   to you is not where we are and not what the facts are before

14   this court.

15              And then as far as the 3D printer, again, there's no

16   reason to believe as to why the aunt should know or not know

17   as to what may or may not have happened with the 3D printer.

18   So I think that's just the government making assertions that

19   just are not established by the evidence before you.

20              But as to the overriding issue as to whether a

21   third-party custodian, if the Court needs to hear from the

22   aunt, we can certainly have her testify as to her work and the

23   flexibility and things of that sort, but I believe where we

24   really are is to whether or not this gentleman is a threat to

25   the community.  And there's certainly the rhetoric, which is a

U.S.A. v. Lopez - 7/14/2023

1   concern and we recognize that is a concern, but when we

2   compare the rhetoric to the actual conduct and the actual

3   record of Mr. Lopez, I would suggest to you that it's not

4   established that he's a danger to the community.

5          THE COURT:  Thank you, Mr. Schick.

6          Mr. Lopez, can you please stand, sir?

7          Mr. Lopez, the issue before the Court is whether

8   there are conditions or a combination of conditions that the

9   Court can impose to reasonably ensure your appearance and the

10  safety of the community.  Based on the nature of the charges,

11  the burden rests with the government by clear and convincing

12  evidence as to danger to the community or others and by a

13  preponderance of the evidence on risk of flight.

14         Mr. Lopez, I'm going to review the factors the Court

15  is required to consider, but I want to let you know that I

16  believe the government has met its burden here today as to

17  both flight risk and to danger to the community.

18         Pursuant to 18, United States Code, 3142(g), the

19  Court is to consider the following factors:

20         The nature and circumstances of the offense charged,

21  including whether the offense involves firearms, explosives,

22  or destructive devices.  The Court would find that that would

23  weigh in favor of detention, Mr. Lopez.

24         The weight of the evidence against the person, as

25  Mr. Garnett points out, of all the factors the Court is to

1    consider, the Court should give -- place the least amount of

2    emphasis on that factor, but the Court still finds that that

3    factor would weigh in favor of detention.

4         The history and characteristics of the person,

5    Mr. Garnett touched on one issue and the evidence here today

6    did not so the Court is relying on the pretrial report and the

7    information contained on the pretrial report, but the Court

8    has serious concerns about Mr. Lopez's mental health history,

9    specifically as detailed in the pretrial report.

10        Mr. Schick points out the community ties, but the

11   Court would find, even if it could get to this point in the

12   analysis, the Court would find that the aunt is not a suitable

13   third-party custodian based on the evidence presented here

14   today regarding visits to Field & Stream and other stores.

15   And the evidence with regards to what was present in that

16   house and in that shed, and that certainly would not be a

17   suitable residence to release Mr. Lopez to.

18        So the Court would find that the history and the

19   characteristics of Mr. Lopez would weigh in favor of

20   detention.

21        Lastly, the Court is required to consider the nature

22   and the seriousness of danger to any person or the community

23   that would be posed by the person's release.  This factor

24   specifically weighs in favor of detention.  The concerns here

25   are raised with the social media posts.  The evidence that I

U.S.A. v. Lopez - 7/14/2023

1  have in front of me here today is the existence of -- and

2  confirmation of eight explosive devices, many of which either

3  had the defendant's DNA or fingerprints on them, and the 3D

4  printing or attempts at printing of firearms.  Couple that

5  with the rhetoric referenced by Mr. Schick and, unfortunately,

6  the Court finds that that raises very serious concerns

7  regarding the danger that Mr. Lopez could pose to the

8  community and to others.  So for that reason the Court would

9  find that the government has met its burden by clear and

10 convincing evidence as to danger to the community.

11         Having made those -- having undergone that analysis

12 of the 3142(g) factors, the Court would make the following

13 findings:

14         That Mr. Lopez poses a risk of nonappearance based on

15 the mental health issues discussed on the record, based on

16 pretrial, probation, and parole, supervised release status and

17 compliance.  The lack of verifiable legitimate employment is

18 an issue for the Court.  The fact that evidence here today was

19 that large purchases were being made without any verification

20 of any legitimate employment is concerning to the Court, but

21 the Court also takes into account with regards to the risk of

22 nonappearance the evidence presented here today regarding

23 Mr. Lopez's views on authority and specifically law

24 enforcement.  And while the charge was ultimately dismissed,

25 evidence was presented here today regarding the review of body

U.S.A. v. Lopez - 7/14/2023

1   cam footage where he assaulted law enforcement.

2          So the Court finds those are all reasons that the

3   defendant poses a risk for nonappearance.

4          As to assessment of danger, the Court finds that he

5   poses a risk of danger based on the nature of the instant

6   offenses; his prior arrests and convictions, which involve a

7   domestic situation; paramilitary activity, and I'll hold off

8   in going as far as terrorism, but certainly military activity;

9   apparent mental health issues; pretrial, probation, parole,

10  supervised release status and compliance and criminal activity

11  while under supervision.  The Court also believes the

12  defendant poses a risk of danger based on his affiliation or

13  expression of extremist ideologies including white supremacy

14  ideologies.

15         So for those reasons, the Court will find the

16  government has met his burden.

17         And, Mr. Lopez, for those reasons, the Court will

18  find that you need to be held in custody pending further

19  proceedings in this matter.

20         Is there anything further we need to take up,

21  Mr. Garnett?

22         MR. GARNETT:  No, Your Honor.  Thank you.

23         THE COURT:  Mr. Schick, anything further, sir?

24         MR. SCHICK:  No, sir.

25         THE COURT:  I want to thank both counsel for their

U.S.A. v. Lopez - 7/14/2023

1  arguments, for the production, efficient production of the

2  evidence.

3          And in terms of the aunt, ma'am, thank you for your

4  willingness to serve in this role as third-party custodian.

5  However, the Court is required to consider these factors in

6  3142(g) and the Court believes that the 3142 factors mandate

7  that Mr. Lopez be held in detention pending further

8  proceedings in this matter.

9          At this time, sir, I'll need to remand you to the

10 custody of the United States Marshal.

11         THE CLERK:  All rise.  This Court stands adjourned.

12     (Court adjourned at 3:30 p.m.)

13                      CERTIFICATE

14 I, Melissa H. Custis, certify that the foregoing is

15 a correct transcript from the electronic record of

16 proceedings in the above-entitled matter.

17

18 /s/  Melissa H. Custis, RPR          Date: 8/23/2023

19

20

21

22

23

24

25