# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>XAVIER LOPEZ,<br><br>*Defendant*. | Case No. 3:23-cr79-DJN |

## RESPONSE IN OPPOSITION
## TO DEFENDANT'S MOTION FOR REVOCATION OF DETENTION ORDER

The United States of America, by Jessica D. Aber, United States Attorney, and Thomas A. Garnett, Assistant United States Attorney, files this Response in Opposition to the Defendant's *Motion for Revocation of Detention Order and Request for Expedited Hearing* (Dk. No. 24). The United States continues to oppose the defendant's release, and respectfully submits that the Magistrate Judge's determination that no condition or combination of conditions could reasonably assure the safety of the community or the defendant's appearance at subsequent proceedings (*see* Dk. No. 17) was (and remains) supported by overwhelming evidence.

## Argument

In support of this position, the United States submits the following:

1. The defendant was indicted by an Eastern District of Virginia grand jury on June 22, 2023. The grand jury returned a two-count indictment against the defendant, charging him in Count One with Possession of Ammunition by Convicted Felon (in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)) and in Count Two with Possession of a Destructive Device (in violation of 26 U.S.C. §§ 5841, 5845, and 5861).

2. The defendant was arrested on July 11, 2023. The United States moved for detention, and Magistrate Judge Mark R. Colombell conducted a detention hearing on July 14.[1] During that hour-long hearing, the United States called a law enforcement witness and presented evidence.[2] The Pretrial Services Report and the evidence presented by the United States during that hearing established the following.[3]

    a. Pertinent to the defendant's risk of flight, that, *inter alia*:

        i. In the months preceding the defendant's arrest on state charges (that is, November 13, 2022), the defendant repeatedly and vociferously stated his contempt for governmental authority and law enforcement in a series of online postings (using an alias), to include urging his online followers to "*have absolutely zero regard for the 'law and order' of the kike system that hates you*." Gov't Exhibit 2 (online posting dated September 1, 2022).

        ii. The defendant's contempt for law enforcement authority was homicidal in nature—he instructed his online community to shoot and "attack" law enforcement officers, stating in his postings (*see* Gov't Exhibit 2) that his followers should:

> "*have no tolerance for cops. if they come to your house, that's your cue to shoot them. if you hear of cops at your white neighbor's house, that's also your cue to shoot them. if you hear of cops beating up a white man in your area, get together to attack the whole police department and even go*

---

[1] The transcript of that hearing is attached as Gov't Exhibit 7.

[2] The list of the United States' detention hearing exhibits is available at Dk. No. 15-1 ("*Exhibit and Witness List*"); those exhibits are likewise attached as exhibits to this filing, utilizing the same numbering convention.

[3] The United States notes—and concurs with—the U.S. Probation Office's assessment in the Pretrial Services Report (Dk. No. 14) that "[t]here is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required and the safety of the community," and its corresponding recommendation that "the defendant be detained." Dk. No. 14, at 6.

>  *so far as to break your white brothers out of prison if possible.*" [sic]

iii. The defendant described in his online postings his intent to conceal his identity and his activities in order to prevent law enforcement or governmental authorities from discovering or monitoring his efforts to acquire weapons and ammunition—and encouraged others to operate in like fashion to assist each other in evading law enforcement detection. The defendant explained to his followers, e.g., that they could build untraceable weapons with materials (such as weapons part kits and 3D printers) which "can quite easily be bought untraceably, especially if everyone in the group holds mail for each other, and any debit cards used are purchased with cash and are registered under a pseudonym when necessary." Gov't Exhibit 3.

iv. During the defendant's previous state arrest, the defendant—after being placed into an officer's squad car—attempted to gain control over a knife; disobeyed the officer's instructions to put the knife down; and then, when the officer attempted to remove the defendant from the squad car, assaulted the officer. Gov't Exhibit 7, at 14-15.

v. The offenses charged in the instant indictment took place while the defendant was under a term of good behavior and supervised probation (stemming from his August 2020 felony conviction in Henrico County Circuit Court), and as such, subject to terms that included the "surrender all firearms and firearm equipment, including ammunition and firearm parts," and further, that he have "no contact with weapons of any kind, including firearms, ammunition and firearm parts." Dk. No. 14, at 4-5.

vi. Further, while on felony supervised probation with Henrico County, the defendant (after being instructed to provide verification about his purported enrollment in community college) "admitted that he lied about his enrollment" to his probation officer.  *Id.*, at 5.

vii. The defendant lacked any verifiable employment—but that despite lacking any outside source of income, somehow obtained funds (from someone or somewhere) sufficient to complete online purchases of burglary tools and a 9mm handgun build kit, purchases which in the aggregate cost more than $600.   *See* Gov't Exhibit 7, at 31-32; Dk. No. 14, at 2-3.

viii. The defendant suffers from some level of mental health issues, as evidenced by his suicide attempt in 2018, and the defendant's evasive response about his mental health history in his Pre-Trial services interview (the defendant responded to the officer that he "would have to think about [his history of mental heath issues] for more than we have time for.").   Dk. No. 14, at 3.

ix. The weight of the evidence against the defendant was extremely strong, and included (1) the fact that the ammunition and six of the Molotov cocktails charged in the indictment were discovered in the defendant's bedroom in the residence he shared with his aunt (Gov't Exhibit 7, at 36-38); (2) the defendant's admissions and statements to federal agents regarding both the ammunition recovered from his bedroom and the eight Molotov cocktails recovered from his bedroom and a back-yard shed (*Id.*, at 40-42); (3) the presence of the defendant's fingerprints on three of those Molotov cocktails (*Id.*, at 39); and (4) the recovery of the defendant's DNA on six of the

Molotov cocktails (*Id.*).

b. Pertinent to the defendant's risk of danger to the community, that, *inter alia*:

i. The defendant (at the least) possessed eight Molotov cocktails, including six such devices found co-located in the same bag that contained 9mm handgun ammunition—destructive devices that had been designed and constructed for extra lethality through the addition of polystyrene to the gasoline mixture (as the FBI agent explained, that mixture would have formed an improvised napalm—"flaming jelly"—when the device was employed). Gov't Exhibit 7, at 34-39.

ii. The defendant—a convicted felon, and currently under a term of good behavior—had used an alias to purchase a 9mm handgun build kit online, (consistent with the weapons acquisition and identity concealment techniques advocated for by the defendant in his online postings). Gov't Exhibit 7, at 32; Gov't Exhibit 3.

iii. The defendant—again, consistent with the instructions he relayed to his online followers—had also acquired a 3D printer, and had used that printer to attempt to create the lower receiver for a handgun; officers recovered this 3D print attempt in the defendant's bedroom (next to the 3D printer), along with the parts to the defendant's 9mm handgun build kit and a box containing 25 rounds of 9mm handgun ammunition. Gov't Exhibit 7, at 39-40; Gov't Exhibit 3.

iv. The defendant's online postings, issued in the months and weeks preceding his November 2022 arrest, reflect his violent hatred of minorities ("*start*

5

*ganging up on and beating every nigger and kike you see*"); his calls for the murder of law enforcement officers; his exhortations to his online followers that "*this is total war . . . let's start acting like it*"; and his corresponding instructions to his followers to arm themselves by "*raid*[ing] *a military or police armory*," and to "*manufacture pipe bombs*," in order to "*take over territory and destabilize the system*."   Gov't Exhibits 2, 4.

c. Pertinent to the inadequacy of the defendant's proposed release plan, that:

   i. The defendant's proposed employment—purportedly working for a tree-cutting service—was neither feasible nor advisable, given the necessarily mobile nature of that line of work and the varied work locations the defendant would be traveling to and from in the course of each day.   Dk. No. 14, at 2-3; Gov't Exhibit 7, at 53.

   ii. The defendant's proposed third-party custodian—his aunt—was the sole other occupant of the small, single-level residence from which law enforcement officers recovered eight Molotov cocktails and 9mm ammunition; from which the defendant had completed online purchases of 9mm handgun build kits and burglary tools; and from which the defendant authored incendiary online postings calling for the production of untraceable firearms (and pipe bombs) and attacks on law enforcement and racial and religious minorities.

   iii. The defendant's proposed third-party custodian had—in the weeks and months following her nephew's completion of his state prison sentence for a felony conviction—driven the defendant to <u>three</u> separate stores with

6

firearms sections and accompanied the defendant as he browsed firearms and ammunition that he was forbidden by law from possessing. *See* Gov't Exhibit 7, at 19-23; Gov't Exhibit 1 (still images from a Charlottesville Field & Stream store's surveillance video).

iv. The defendant's proposed third-party custodian had prior notice of the defendant's intent to assemble firearms and explosives even before the defendant returned to her residence. The evidence presented during the detention hearing established that the defendant's aunt kept in her bedroom nightstand a letter from the defendant, which the defendant had mailed to her while incarcerated on that state charge. In that letter, mailed approximately a month before the defendant completed his state sentence and returned to his aunt's residence, the defendant explained to his aunt: (1) his apocalyptic and violent world view; his belief that "*our government is evil*"; (2) his desire to "*destroy*" a broad swath of humanity (to include "*Jews, Liberals, communists, degenerates, Zionists, progressives, capitalists, globalists, and green-party PETA-type environmentalists . . .*"); and (3) his preference to "*die by the sword for the Lord's name than to live long on earth peacefully serving Satan's laws*." Gov't Exhibit 6.

v. The defendant's missive to his proposed third-party custodian also explicitly advised her that when the defendant returned to the residence, he intended to undertake the exact criminal activity for which he now stands charged:

> "*It must be said that unless I am able to build guns, explosives, and other forms of weaponry & store them in my*

7

> *room without fear of the law finding out about it from you, I cannot fully trust in anything you say or do*."

      vi. The defendant's criminal record includes an assault charge in which the victim of the alleged assault was his aunt (that is, his proposed third-party custodian). Dk. No. 14, at 4.

3. After receiving this evidence and the parties' arguments, Magistrate Judge Colombell reviewed the statutory factors enumerated in the Bail Reform Act (18 U.S.C. § 3142(g)(1)-(4)). Gov't Exhibit 7, at 60-62. The Court explained that each of those factors weighed in favor of detention, pointing first to the "nature and circumstances of the offense" and the fact that the charges in question in fact "involve[d] . . . a destructive device," an aggravating factor under the Code. Gov't Exhibit 7, at 60; 18 U.S.C. § 3142(g)(1). After noting that the "weight of the evidence" factor "would weigh in favor of detention," the Court turned the to the third statutory factor: the defendant's "history and characteristics." Gov't Exhibit 7, at 60-61. The Court noted its concerns with the defendant's mental health history, and its conclusion that the evidence presented had established that the defendant's aunt was not a suitable third-party custodian, in determining that this third factor likewise "would weigh in favor of detention." *Id*. at 61. Finally, the Court turned to the fourth factor, the "nature and seriousness of danger to any person or the community that would be posed by the defendant's release," concluding that having considered the nature of the defendant's rhetoric and his efforts to assemble both explosives and a firearm, this factor "specifically" weighed in favor of the defendant's detention. *Id*. at 61-62.

4. The Court subsequently entered an Order of Detention, ruling that "the defendant must be detained pending trial because the Government" had proven both that (1) "by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of any other person and the community," and (2) "By a preponderance of evidence

8

that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required." Dk. No. 14, at 2. The Magistrate Judge relied upon no fewer than four independent reasons underpinning the Court's conclusions, and then took the time to further detail an *additional* six reasons that informed the Court's decision to order the defendant's pre-trial detention. *Id.*, at 2-3.

5. While a defendant is entitled to a *de novo* district court review of the Magistrate Judge's detention determination,[4] the district court need not conduct a second evidentiary hearing and may rely upon a transcript of the detention hearing before the magistrate judge. *See*, *e.g.*, *United States v. Williams*, 753 F.2d 329, 334 (4th Cir. 1985) ("Moreover, in most cases, a trial court's review of a transcript of proceedings would, either as part of a de novo detention hearing, or as part of a review of a detention order under 18 U.S.C. § 3145(b) be sufficient to withstand appellate review."); *United States v. Boyd*, 484 F. Supp. 2d 486, 487 (E.D. Va. 2007); *United States v. Woodward*, No. 2:21-CR-122, 2021 WL 5985170, at *2 (E.D. Va. Dec. 16, 2021) (concluding that the district court could resolve a defendant's motion to revoke the magistrate judge's detention order on the parties' papers, without a hearing).[5]

6. Accordingly, the United States respectfully submits that this Court's review of the transcript of the July 14, 2023 detention hearing before Magistrate Judge Colombell (as well as the accompanying exhibits entered by the United States during the course of that proceeding, and attached as exhibits to this filing) overwhelmingly establishes the correctness of Magistrate Judge Colombell's ruling (consistent with United States Probation Office's assessment) that no conditions exist that can reasonably assure the safety of the community or the defendant's

---

[4] *United States v. Clark*, 865 F.2d 1433, 1436 (4th Cir. 1989).

[5] More recently, *see United States v. Berkley*, 3:22cr101-MHL, Dk. No. 64 at 1-2 (District Judge Lauck deciding a defendant's motion to revoke a detention order on the detention hearing transcript).

appearance at subsequent proceedings.

## Conclusion

For the foregoing reasons, the United States respectfully requests that Court deny the defendant's motion.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Thomas A. Garnett
VSB Bar No. 86054
Assistant United States Attorney
United States Attorney's Office
919 East Main St., Suite 1900
Richmond, VA 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Thomas.A.Garnett@usdoj.gov