**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

UNITED STATES OF AMERICA

v.

XAVIER LOPEZ,

      *Defendant*.

Case No. 3:23-cr79-DJN

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS**

The United States of America, by Jessica D. Aber, United States Attorney, and Thomas A. Garnett, Assistant United States Attorney, files this Response in Opposition to the Defendant's *Motion to Suppress* (Dk. No. 38), which asserts an entitlement to an evidentiary hearing pursuant to *United States v. Franks* (438 U.S. 154 (1978)).   Because the defendant cannot point to any deliberately false statement or material omission in the affidavit that secured a Henrico County Circuit Court-issued search warrant, and because the affidavit taken as a whole overwhelmingly established probable cause for that search of the defendant's residence, the defendant is not entitled to a *Franks* hearing, and the Court should deny the defendant's motion to suppress on the papers.

**Factual Background**

The defendant was arrested by Henrico County law enforcement officers in August of 2020 after witnesses observed the defendant—while strolling through an area near his Henrico residence with a "Bonnie Blue" flag—using a knife to slash the tires of another individual's vehicle.   Law enforcement officers were able to identify the defendant from these descriptions, and ultimately responded to the defendant's residence at 1419 Fort Hill Drive.   During a search of the defendant's residence pursuant to a state search warrant on August 18, 2020, law enforcement

officers observed that the back porch of the defendant's residence contained a firearms workshop, with items that included firearms components (such as AR-15 upper and lower receivers), an AR-15 jig kit, tools such as fixed-base routers and drills, and metal shavings from the use of those tools to adjust firearm components.  *See* Gov't Exhibits 1-A through 1-H (photographs of the defendant's firearms workshop at 1419 Fort Hill Drive, depicting tools such as a fixed-base router, an AR-15 jig kit, and AR-15 rifle components).  Law enforcement officers also observed a significant quantity of ammunition, some of it in AR-15 compatible magazines.  *See, e.g.,* Gov't Exhibits 1-C and 1-D (photographs of some of the ammunition observed by law enforcement).  Law enforcement officers also confirmed that the defendant shared the Fort Hill Drive residence with a single other family member.

Investigators also confirmed that the defendant had purchased an AR-15 style rifle in September of 2019, and purchased 1,000 rounds of .223 and 5.56mm rifle ammunition (and 10 rifle magazines) in November of 2019.  *See* Gov't Exhibit 2-A (ATF Form 4473 documenting defendant's purchase of AR-15 type rifle on September 9, 2019); Gov't Exhibit 2-B (Colonial Firearms receipt documenting the sale of that firearm to defendant); and Gov't Exhibit 2-C (Colonial Firearms receipt documenting ammunition sale to defendant on November 6, 2019).

The defendant was ultimately convicted of a charge of Felony Vandalism, in violation of Virginia Code § 18.2-137.   The Henrico County Circuit Court sentenced the defendant to a term of five years' imprisonment, with four years suspended.  *See* Gov't Exhibit 3 (Henrico County Circuit Court sentencing order).  As a convicted felon, the defendant was henceforth legally prohibited (under both federal and state criminal code) from possessing firearms or ammunition.

As a result of the defendant's conviction, he was ordered to surrender all firearms, firearm components, and ammunition to the Henrico County Police Department.  *See id*. at 2.  On

January 6, 2021, the defendant's family member collected such property belonging to the defendant from the defendant's residence at 1419 Fort Hill Drive and surrendered those items to the Henrico County Police Department, along with an inventory of those items created by the family member.    *See* Gov't Exhibit 4 (Henrico County Police Department inventory/receipt).[1]

The defendant's property included:

- More than 1,000 rounds of 5.56mm/.223 ammunition[2]

- (15) AR-style magazines with 30 round capacity

- (2) 40 round AR-style magazines

- (4) AR-15 80% lower receivers (also referred to as "80% lowers")[3]

- (1) jig kit for AR-15 80% lower receivers[4]

- (3) complete AR-style upper receivers[5]

- (4) AR-style trigger/handle kits, and four AR-style stocks.

---

[1]    The handwritten notations on the family member's inventory / receipt were created by a law enforcement officer, summarizing the nature of the defendant's property surrendered by the defendant's family member.

[2]    The caliber of ammunition utilized by AR-15 style rifles—lightweight, semi-automatic, magazine-fed firearms.

[3]    A "lower receiver" is an integral portion of a functioning firearm, connecting to the other pieces of a finished firearm and to which the trigger group, upper receiver, and frame are attached.  A completed lower receiver is a "firearm" under United States Code, and is required to bear a serial number.  An "80% lower" is an unfinished lower receiver.  This unfinished receiver does not have certain holes drilled out that would be required for the firearm to function.  As the "80% lower" is not a completed "firearm" for purposes of United States Code, the purchase of this item does not require the background check and traditional requirements for the purchasing a working firearm.

[4]    In order to convert an "80% lower" into a fully-operable lower receiver (that is, a "firearm" for purpose of United States Code), an individual can utilize specialized machinery (such as a router or drill press) and a "jig kit" (a template for the proper placement of the final drill holes) to drill out the remaining holes.

[5]    An "upper receiver" is another necessary component of an AR-15 style rifle, connecting the barrel, bolt carrier group, and charging handle to the AR-15's lower receiver.  Other components of an AR-15 style rifle include a trigger and handle kit, as well as a stock (the back portion of a rifle, often referred to as a "shoulder stock" or "buttstock").

Two different Federal Bureau of Investigation (FBI) agents testified to the fact of defendant's surrender of these items to the Henrico County Police Department at two separate federal detention hearings before a United States Magistrate Judge and this Court (on July 14 and October 30 of 2023, respectively).   One FBI agent confirmed that the defendant "had a functional firearms manufacturing setup at the 1419 Fort Hill Drive residence" at that point in 2020.   *See* Gov't Exhibit 5 at 15-19 (Transcript of Magistrate Court detention hearing on July 14, 2023).   The defendant did not challenge the accuracy or truthfulness of their testimony, or in any way dispute the fact of his possession—up until his court-ordered surrender—of those items.   *Id.*

The defendant completed the active portion of his state sentence on June 28, 2021, and returned to the 1419 Fort Hill Drive residence, where he resumed living with his family member. In the following months, the defendant visited the firearms sections of at least three different sporting goods stores.   The defendant completed the first of these visits less than a week after his release from state prison, traveling at least 60 miles from his Henrico residence to a sporting goods store located in Charlottesville, Virginia (Field & Stream) on July 4, 2021.   During this visit— which was captured on the Field & Stream store's surveillance camera footage (*see* Gov't Exhibit 6)—the defendant and his family member moved to the store's firearm section, where the defendant spent time looking at the firearms (displayed in glass cases) offered for sale.

During another visit (on a later date) to the firearms section of a different sporting goods store, investigators learned from store personnel that the defendant had engaged in a conversation with an employee in the firearms section about the defendant's interest in firearms—specifically, that the defendant had described wanting to build a .308 caliber rifle with an 11.5-inch barrel, and that he (the defendant) wanted to locate 168 grain Winchester 308 ammunition to use with that rifle.   Federal agents testified to the fact of the defendant's travels to view (and discuss) firearms

in the months following his arrest during the defendant's two detention hearings, as described above; again, the defendant did not object to or otherwise dispute the validity of their accounts—which included the introduction into evidence of surveillance video from the defendant's July 4, 2021 trip to the Charlottesville sporting goods store.  *See*, *e.g*., Gov't Exhibit 5 at 19-23; Gov't Exhibit 6 (Field & Stream surveillance video of defendant and family member from July 4, 2021).

Aware that the defendant had previously been active online (that is, prior to his state arrest and conviction in 2020), law enforcement officials began to investigate the defendant's current online activity.  Investigators confirmed that the defendant's residence at 1419 Fort Hill Drive was assigned a discrete Internet Protocol (IP) Address of 73.12.94.90.  A review of the online activity conducted through that IP Address established that this IP address had been used to access a specific social media account ("Cru54d3r") on the "Gab" platform, and to make numerous postings on that account.  Those postings reflected the poster's vociferous contempt for governmental authority and law enforcement, including calls for the killings of police officers.[6] The postings from the defendant's residence's IP address also reflected the poster's rejection of the legal prohibition on convicted felons' possession of firearms, and his instructions (to the poster's online followers) on how to create their own firearms.[7]  The postings from the defendant's residence's IP address also reflected the poster's familiarity with the means through which an

---

[6]      To cite one example, from a posting made via IP Address 73.12.94.90 on September 1, 2022: "*[H]ave no tolerance for cops.   if they come to your house, that's your cue to shoot them.   if you hear of cops at your white neighbor's house, that's also your cue to shoot them.   if you hear of cops beating up a white man in your area, get together to attack the whole police department and even go so far as to break your white brothers out of prison if possible.*" [sic]   Gov't Exhibit 7.

[7]      To cite one example, from a posting made via IP Address 73.12.94.90 on October 5, 2022:   "*@Lilr and no, being a convicted felon is not at all a valid excuse for remaining unarmed, stay strapped or get clapped. If you don't have a gun yet, at least acquire the means to make one, parts kits are everywhere and 3d printers are pretty cheap now too. You can also have a decent side hustle selling your builds to our white brothers across the pond and all around the world for monero over TOR or isp.*"   Gov't Exhibit 8.

individual could, in fact, create untraceable firearms:  "*All real weapons should be built, not bought, this can be done with a 3D printer and a parts kit, both of which can quite easily be bought untraceably, especially if everyone in the group holds mail for each other, and any debit gift cards used are purchased with cash and registered under a pseudonym when necessary, ammo and magazines should be standardized for each type (carbines being .223/5.56 and STANAG mag compatible, shotguns being .12 gauge, handguns being 9mm and Glock mag compatible, etc.)...*"[8]

Additional postings on the Gab "Cru54d3r" account described the poster's hatred of religious and racial minorities, and the poster's exhortations to his online followers to "*start ganging up on and beating every nigger and kike you see*"; his calls for the murder of law enforcement officers; his exhortations to his online followers that "*this is total war . . . let's start acting like it*"; and his corresponding instructions to his followers to take up active and violent resistance against the government by arming themselves by "*raid*[ing] *a military or police armory*," learning how to "*manufacture pipe bombs*," in order to "*take over territory and destabilize the system*."   *See* Gov't Exhibits 8 and 9 (Postings on the "Cru54d3r" Gab account on September 1, 2022 and October 4, 2022, respectively).

Law enforcement investigators also established that the defendant's residence's IP Address had also been utilized to complete a number of online purchases from several different retailers, and that those purchases had subsequently been delivered to the defendant's residence at 1419 Fort Hill Drive.[9]   Those purchases, completed via the defendant's residence's IP Address, included a

---

[8]    From a posting made via IP Address 73.12.94.90 on October 7, 2022.  Gov't Exhibit 8.

[9]    The defendant's motion seems to insinuate (*see* Def. Motion at fn 1) that law enforcement learned of the fact of these purchase and deliveries through the illicit seizure and opening of sealed packages (while at or en route to the defendant's residence, presumably).   This is incorrect.   Law enforcement investigators learned of these online purchases—and the contents of the packages shipped to the defendant's residence— via court-ordered legal process directed to the businesses in question.   The defendant of course possesses no Fourth Amendment right to privacy in the information he voluntarily provided to those third-party businesses, a legal principle well established by the Supreme Court's "Third Party Doctrine."   *See*, *e.g.*,

"G19 Build Kit" sold by US Patriot Armory.   This firearm build kit (for a 9mm Glock-style handgun) included the slide, barrel, a lower parts kit, an upper receiver build kit, and a magazine. US Patriot Armory employees, in response to legal process, confirmed that the 9mm handgun build kit was purchased by the billing name of "John Jackson," utilizing IP Address 73.12.94.90; and that this firearm build kit was delivered on September 1, 2022, and signed for by an individual at the defendant's residence.   *See* Gov't Exhibit 5 at 32.

Other online transactions completed using the defendant's residence's IP Address (but with purported "customer" names other than the defendant's) were the purchases, on three different occasions in July and August of 2022, of lock-picking devices—including tools designed to allow the user to defeat the locking mechanisms of commercial doors, garage doors, vehicles, and other locks (such as padlocks).   Vendor records established that the online vendor (Sparrows Lock Picks) shipped the purchased items to the defendant's residence.

The Henrico County Police Department submitted an application for a search warrant to the Henrico County Circuit Court on November 12, 2022, supported by an affidavit that recounted these and additional facts.   *See* **Gov't Exhibit 10** (Henrico County Circuit Court search warrant materials).   The Circuit Court reviewed the application, found probable cause for a search of the defendant's residence, and issued the requested search warrant.[10]   Henrico County Police Department officers executed that warrant on November 13, 2022, and located (*inter alia*) eight Molotov cocktail-type incendiary devices, (25) rounds of 9mm handgun ammunition, another

---

*United States v. Miller*, 425 U.S. 435, 443 (1976) (The Supreme Court "has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.").

[10]     Specifically, the Circuit Court found probable cause in relation to state criminal charges pertaining to Paramilitary Activity (in violation of VA Code § 18.2-433.2), Attempted Possession of a Firearm by a Convicted Felon (in violation of VA Code §§ 18.2-26 and 308.2), Possession of Burglarious Tools (in violation of VA Code § 18.2-94), and Acts of Terrorism (in violation of VA Code § 18.2-46.5(C)). *Id.* at 3.

round of 7.62mm ammunition, a 3D printer, the 9mm handgun firearm build kit purchased from Patriot Armory, attempts to 3D print the frame for a 9mm handgun, and the lock-picking devices shipped to the defendant's residence by Sparrows Lock Picks. *See* Gov't Exhibit 10 at 7-10 (search warrant return for the search of 1419 Fort Hill Drive). These items—specifically, the Molotov cocktails and the ammunition—form the basis for Counts One and Two of the pending Indictment against the defendant. *See* Dk. No. 6 (Indictment).

## Legal Argument

"A *Franks* hearing provides a criminal defendant with a narrow way to attack the validity of a search warrant affidavit." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021). To be entitled to a *Franks* hearing, a defendant must make a three-part "substantial preliminary showing." *United States v. Moody*, 931 F.3d 366, 370 (4th Cir. 2019). First, a defendant must show that the affidavit contains a false statement. *Id.* Such a showing "cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts." *Id.* Second, a defendant must make a showing of "intentional falsity or reckless disregard for the truth." *Id*. at 371. In satisfying this requirement, "the defendant must provide facts—not mere conclusory allegations—indicating that the officer subjectively acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate." *Id.* And third, "the defendant must show materiality—that is, that the false statements were 'necessary to the finding of probable cause.'" *Id.* (quoting *Franks*, 438 U.S. at 156). Defendants bear the burden of satisfying the requirements for a *Franks* hearing, which "is a heavy one." *United States v. Jeffers,* 22 F.3d 554, 558 (4th Cir. 1994). Because there is "a presumption of validity with respect to the affidavit supporting the search warrant," a defendant must do more than merely make "conclusory" allegations to succeed. *Franks,* 438 U.S. at 171.

A defendant can also seek a *Franks* hearing for an alleged omission of a material fact. *United States v. Colkley*, 899 F.2d 297 (4th Cir. 1990). "When a defendant relies on an omission [in the search warrant], this heavy burden is even harder to meet." *United States v. Haas*, 986 F.3d 467, 474 (4th Cir. 2021). The defendant "must provide a substantial preliminary showing that (1) law enforcement made an omission; (2) law enforcement made the omission 'knowingly and intentionally, and with reckless disregard for the truth,' and (3) the inclusion of the omitted evidence in the affidavit would have defeated its probable cause.'" *Id*. (quoting *Colkley*, 899 F.2d at 300-01).

The defendant cannot meet his burden to show he is entitled to a *Franks* hearing, because he cannot demonstrate that the search warrant affidavit contained any false statements or any material omission (let alone one made with reckless disregard for the truth). The United States addresses the defendant's various allegations below.

### 1.  The False Statements Allegations

The defendant's description of the false statements purportedly contained in the search warrant affidavit spans a single page of the defense motion (*see* Def. Motion at 7-8). This "False Statement" section focuses <u>not</u> on the affidavit's lengthy "Material Facts Establishing Probable Cause" section (<u>Gov't Exhibit 10</u> at 14-28), however, but on the Affiant's legal and factual *conclusions*—that is, the affiant's explanation to the reviewing Circuit Court judge about the *import* of the facts that the affiant has previously recited, and the *relationship* between those facts and the legal basis for the warrant. *See* <u>Gov't Exhibit 10</u> at 28-31 ("Based off Your Affiant's training, experience and knowledge pertaining to the facts ascribed in this affidavit, *Your Affiant makes the following assertions . . .*") (emphasis added). The purported "false statements" that the defendant alleges, in short, are generally not actual statements of fact—they are the affiant's

opinions and assertions.

A review of the motion's "False Statement" section locates a single instance wherein the defendant appears to be asserting an actual false *factual assertion* by the affiant: that the defendant had "previously acquired firearms, ammunition, and tools required to transform lower receivers into working firearms."   Def. Motion at 7 (citing to Gov't Exhibit 10 at 28 (Affiant's third bullet point and a portion of fourth bullet point)).[11]

This factual statement by the Affiant is indisputably accurate.   First, as detailed above, the defendant had previously purchased (in September of 2019) an AR-15 style firearm (*see* Gov't Exhibit 2-A).   Additionally, during a search of the defendant's residence in August 2020, law enforcement officers confirmed that the defendant was in possession of numerous firearm parts, ammunition, and tools (such as a fixed-base router and drill) designed to convert unfinished AR-15 lower receivers into fully functional AR-15 lower receivers (that is, operable firearms). *See*, *e.g.*, Gov't Exhibits 1-A – 1-H (photographs of defendant's residence on August 18, 2020).   An FBI agent confirmed under oath (without objection or challenge from the defendant) during the defendant's detention hearing in July of 2023 that the defendant "had a functional firearms manufacturing setup at the 1419 Fort Hill Drive residence" at that point in 2020.   Gov't Exhibit 5 at 15-19 (Transcript of Detention Hearing).

Finally, the defendant's prior possession of firearm components and ammunition is further established by the defendant's surrender of precisely such materials to Henrico County Police (via the defendant's family member), on January 6, 2021—an inventory that included AR-15 rifle parts;

---

[11]      The second half of this particular defense assertion again alleges not a purported false statement of fact, but the defendant's disagreement with the Affiant's *opinion* about the conclusions that could be drawn from the affidavit's probable cause summary—". . . and that [the Affiant] 'reasonably believed that [the defendant] is attempting to possess a firearm in the tools to construct one'" [sic].   *Id*.

a jig kit designed to convert those parts into complete, functioning firearms; machining tools; and more than 1,000 rounds of ammunition.   *See* Gov't Exhibit 4.

The Affiant's factual statement that the defendant had "previously acquired" such materials is clearly accurate, and the defendant's allegation to the contrary is devoid of any support.[12]

The defendant also advances several other claims of purported "false statements" by the affiant—but as noted above, these purported false statements of fact are neither (1) false, and/or (2) actual assertions of fact.   The United States lists and addresses these defense claims below.

    a.   "*There is no information that [the defendant] physically acquired specific items delivered to [the defendant's residence]*."   Def. Motion at 7.   The Affiant did *not* claim in the Affidavit that investigators had firsthand knowledge that the defendant personally took physical custody of the various items (the firearm build kit and lock-picking tools, e.g.) that were ordered utilizing the defendant's residence's IP address and delivered to the defendant's residence.   The defendant may take issue with the Affiant's summation of the Affiant's conclusions about the import of these facts,[13] but the defendant cannot demonstrate the falsity of any of the <u>facts</u> that underlie the Affiant's conclusions: that the defendant's IP address was utilized to order various items from online retailers; and that these items were delivered (as directed in the

---

[12]    To the extent the defendant is attempting to mischaracterize the Affiant's statement as a description of items *currently* in the defendant's possession in November of 2022, such a reading is at odds with the plain text of the affidavit ("*previously* obtained") and in the context of the larger probable cause section (wherein the Affiant notes that the defendant's family member surrendered those items to law enforcement in January of 2021).   <u>Gov't Exhibit 10</u> at 28 (emphasis added), 15-16.

[13]    The Affiant's statements regarding the import of these facts consisted only of eminently reasonable assessments about the relationship between those facts and the question of probable cause:   The Affiant explains to the Court that he "*reasonably believe[d]*" that the order (from) and delivery (to) the defendant's residence of a 9mm handgun build kit was a "substantial step towards acquiring a firearm through nontraditional means;" and that the Affiant "*reasonably believe[d]*" that "other purchases of items including lock picking and lock bypass devices made using false names and/or records related to those purchases will be located at 1419 Fort Hill Drive."   <u>Gov't Exhibit 10</u> at 29 (emphases added).

orders) to the defendant's residence. *See*, *e.g.*, *Moody*, 931 F.3d at 370 ("[A defendant's] first required showing, of falsity, cannot be conclusory and must rest on affidavits or other evidence. As a result, the defendant cannot rely on a purely subjective disagreement with how the affidavit characterizes the facts. Rather, *there must be evidence showing that the statements at issue are objectively false*.") (internal citations omitted) (emphasis added).

b.  "*The detective never had any information indicating any stolen firearm was related to or in the possession of [the defendant]*." Def. Motion at 7-8. This allegation presumably relates to the Affiant's statement he was "aware there have been numerous reports of stolen firearms in the area where [the defendant] resides since he was released from jail." Gov't Exhibit 10 at 30.[14] The defendant does not attempt to demonstrate how this statement by the Affiant is false. The defendant's concern, of course, is the potential nexus between this fact and *another* (also unchallenged) fact: that the defendant's residence's IP address had been recently used to purchase multiple lock-picking tools from an online retailer, and that those items had been shipped (as directed) to the defendant's residence. *See* Gov't Exhibit 10 at 18-19. The defendant's concern about the logical conclusions that the Circuit Court judge might draw regarding the possible relationship between these uncontested facts, however, does not convert either factual statement into a false one.

---

14    The defendant's allegation implies that the Affiant actually claimed in the affidavit to possess information "indicating [a] stolen firearm" was "related to" or "in the possession of" the defendant—but the Affiant made no such claim.

12

c.  "*The detective had no reasonable belief concerning the content of any documents inside [the defendant's] residence.*"  Def. Motion at 8.  This allegation presumably relates to the Affiant's description of the types of documents the Affiant described reasonably expecting to locate within the defendant's residence, including (1) records related to online purchases completed using the defendant's residence's IP address, (2) documents related to the delivery of online purchases to the defendant's residence, and (3) documents related to membership in or affinity with hate groups or paramilitary organizations.  The defendant's claim is indecipherably over-broad and conclusory; it does not actually allege any specific false statement, let alone provide a factual basis supporting such an allegation.

In short, the defendant's claims do not even begin to approach the "substantial preliminary showing" required by *Franks*.  The Supreme Court established that in order to meet this threshold, a defendant must provide an "offer of proof" that affirmatively demonstrates the falsity of a search warrant affidavit—that is, when advancing allegations of deliberate falsehoods, the defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false; and [those allegations] should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."  *Franks*, 438 U.S. at 171.  Here, the defendant's claims consist only of bare allegations, devoid of any factual support—and as such, they are precisely the type of "conclusory" attacks dismissed by the Court in *Franks* as insufficient to "mandate an evidentiary hearing."  *Id*.

## 2.  **The Material Omission Allegation**

The defendant also appears to advance an argument that the search warrant is fatally flawed by virtue of the Affiant's knowing and intentional omission of a material fact from the affidavit. The United States respectfully submits that the purported "omission" identified by the defendant in this regard was neither (1) knowing and intentional, or (2) necessary to the Circuit Court's finding of probable cause.

The defendant's purported omission consists of the claim that in describing the defendant's visit to the firearms section of a sporting goods store, the Affiant "withheld information that when [the defendant] went to gun retailers, he acknowledged his legal restrictions by never physically touching a firearm."   Def. Motion at 7.

To establish an entitlement to a *Franks* hearing on a claim of material omission—an even steeper task than a claim of affirmative falsehood[15]— a defendant must show that the Affiant's omission was "designed to mislead" or that the Affiant omitted the information in question "in reckless disregard of whether [that omission] would mislead" the finder of probable cause. *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990) (citing *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986) (emphasis in original).

A simple reading of the affidavit makes clear that the Affiant did not imply or insinuate that the defendant handled or otherwise possessed firearms at any of the firearms stores—instead, the Affiant's language clearly leads the reader to believe that the defendant did not handle a firearm in the Charlottesville sporting goods store ("[the defendant] can be observed [on surveillance

---

[15]    This is so, the Fourth Circuit explained, because search warrant affidavits are generally drafted by "'nonlawyers in the midst and haste of a criminal investigation,'" and the officer or agent drafting the affidavit "cannot be expected to include in an affidavit every piece of information gathered in the course of an investigation." *United States v. Colkley*, 899 F.2d 297, 300 (4th Cir. 1990) (quoting *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).

video] crouching down to look into a glass case with handguns inside.  [The defendant] did not purchase any items."). Gov't Exhibit 10 at 17-18.  Likewise, as regards the Affiant's description of the defendant's visit to a second sporting goods store's firearm section—wherein the Affiant simply relates that a store employee "recall[ed] [the defendant] being in the store" and the employee's recitation of his conversation with the defendant about the defendant's interest in wanting to build a rifle and acquire ammunition for that rifle.  Gov't Exhibit 10 at 18.  The "omission" in question—assuming *arguendo* it can be characterized as such—was clearly not "designed to mislead" the Henrico County Circuit Court, nor made with "reckless disregard" of whether the omission might mislead the court.  *Id*.

Irrespective, the defendant cannot meet his burden of establishing that the "omission" in question was material—that is, that the information was "necessary for the existence of probable cause."  *United States v. Franks*, 438 U.S. 154, 156 (1978).  As this Court noted in *United States v. Hector*, the court's evaluation of materiality must take into account "the totality of the circumstances" (quoting *Colkley*, 899 F.2d at 301); an omission is therefore only "material" if "the inclusion of the omitted evidence in the affidavit would have defeated its probable cause."  *United States v. Hector*, No. 3:22CR6 (DJN), 2022 WL 5249441, at *6 (E.D. Va. Oct. 6, 2022) (quoting *Haas*, 986 F.3d at 474 (citations omitted)).

Here, the "omission" in question must be placed in the context of approximately 14 pages of undisputed facts detailing the defendant's history of firearm and ammunition collection; the defendant's demonstrated interest in and history of constructing firearms at his residence; the defendant's (post-felony conviction) online advocacy for firearm possession and firearm construction; the issuance of online orders for a handgun build kit and burglary tools from the defendant's residence; the delivery of those orders to the defendant's residence; and the

15

defendant's (post-felony conviction) travel to the firearms sections of multiple sporting goods, where the defendant described to at least one store employee the defendant's desire to build a firearm and acquire ammunition for that firearm).   *See* Gov't Exhibit 10 at 14-28.

Specific to the discrete (purported) omission in question, the Affiant's recitation of the defendant's visits to the firearm sections of the sporting goods stores was pertinent to the finding of probable cause because the fact of the defendant's travel to those stores (and the firearms sections within) demonstrated the defendant's *continued interest in firearms* (including building firearms, per his statements to a store employee) despite his status as a convicted felon.   That the defendant did not physically handle a firearm during these store visits does not somehow negate the obvious inference occasioned by the defendant's *travel to and presence in* those firearms sections, and any claim that an exhaustive listing of the discrete physical actions that the defendant did *not* take while browsing through the firearms sections of those sporting goods stores would have undercut the Circuit Court's finding of probable cause is specious.   The undisputed factual evidence provided to the Circuit Court was overwhelming; the defendant cannot demonstrate that this purported omission was material, and he is therefore not entitled to a *Franks* hearing.

16

## **Conclusion**

For the reasons stated above, the United States respectfully submits that the defendant has not demonstrated that he is entitled to a *Franks* hearing, and the Court should deny the defendant's motion to suppress on the papers.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY


By: _____/s/_____
Thomas A. Garnett
VSB Bar No. 86054
Peter S. Duffey
VSB Bar No. 39477
Assistant United States Attorneys
United States Attorney's Office
919 East Main St., Suite 1900
Richmond, VA 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Thomas.A.Garnett@usdoj.gov