```
                    UNITED STATES DISTRICT COURT

                             FOR THE

                  EASTERN DISTRICT OF VIRGINIA

                       RICHMOND DIVISION



* * * * * * * * * * * * * * *
UNITED STATES OF AMERICA,    * CRIMINAL NO. 3:23-CR-00079
                             * JULY 14, 2023  2:22 P.M.
              Plaintiff,     * ARRAIGNMENT & DETENTION HEARING
                             * VOLUME I OF I
vs.                          *
                             *
XAVIER LOPEZ,                * Before:
                             * HONORABLE MARK R. COLOMBELL
              Defendant.     * UNITED STATES MAGISTRATE JUDGE
* * * * * * * * * * * * * * * EASTERN DISTRICT OF VIRGINIA


APPEARANCES:

For the Plaintiff:      THOMAS A. GARNETT, ESQUIRE
                        PETER S. DUFFEY, ESQUIRE
                        United States Attorney's Office
                        SunTrust Building
                        919 East Main Street
                        Suite 1900
                        Richmond, VA 23219


For the Defendant:      FREDERICK M. SCHICK, ESQUIRE
                        Schick & Schick PC
                        9512 Iron Bridge Road
                        Suite 102
                        Chesterfield, VA 23832


FTR Operator:           Jessica Saunders


Court Reporter:         Melissa H. Custis, RPR
                        701 East Broad Street
                        Richmond, Virginia 23219
                        (804)916-2278


        Proceedings recorded by electronic recording.
Transcript produced by computer.
```

GOVERNMENT
EXHIBIT

**5**

3:23cr079

U.S.A. v. Lopez - 7/14/2023

**WITNESS INDEX**

GOVERNMENT'S WITNESSES:                                    PAGE NO.

**Robert Wright:**

Direct by Mr. Garnett                                          11

Cross by Mr. Schick                                           46


**EXHIBIT INDEX**

| GOVERNMENT'S EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| 1 | | 21 |
| 2 | | 28 |
| 3 | | 29 |
| 4 | | 31 |
| 5 | | 33 |
| 6 | | 43 |

(Court convened at 2:22 p.m.)

THE CLERK:  The Honorable Mark R. Colombell, United States Magistrate Judge, presiding.

This court is now in session.  Please be seated and come to order.

THE COURT:  Good afternoon.

MR. GARNETT:  Good afternoon, Your Honor.

MR. SCHICK:  Good afternoon, Your Honor.

THE COURT:  Madam Clerk, will you please call our next matter.

THE CLERK:  Case Number 3:23-CR-79, *United States of America versus Xavier Lopez.*

The United States is represented by Thomas Garnett and Peter Duffey.

The defendant is represented by Frederick Schick.

Are counsel ready to proceed?

MR. GARNETT:  The United States is ready, Your Honor.

MR. SCHICK:  Defense is ready, Your Honor.

THE COURT:  Thank you both, gentlemen.

Mr. Garnett, good afternoon, sir.

MR. GARNETT:  Good afternoon, Your Honor.

Judge, we're here for a detention hearing and an arraignment.  I'm happy to take those in whichever order Your Honor would prefer.

THE COURT:  If we could put the type of hearing --

well, you put the type of hearing on the record.  If we could put on the penalties once again, then the Court will provide -- and the speedy trial calculation, then the Court will provide the Rule 5(f) notice.

MR. GARNETT:  Yes, Your Honor.  One moment, please.

Your Honor, in terms of the charges the defendant is facing, it's a two-count indictment.  Count One charges possession of ammunition by a convicted felon, in violation of 18, United States Code, Section 922(g)(1).  The maximum penalties for that offense are a term of up to 15 years incarceration, a fine of up to $250,000, up to three years supervised release, and a $100 special assessment.

Count Two charges possession of a destructive device, in violation of Title 26, United States Code, Sections 5841, 5845, and 5861(c),(d), and (f).  That charge carries a maximum possible penalty of ten years incarceration, a fine of up to $10,000, up to three years supervised release, and a $100 special assessment.

And, Your Honor, in terms of the speedy trial cutoff --

MR. DUFFEY:  I have September 19th.

MR. GARNETT:  We calculate it as September 19th, Your Honor.  I have not actually consulted with Mr. Schick as to that date.  I understood we would be having a conference call with Judge Novak that would have -- would render that

somewhat moot in terms of the next 70 days.

THE COURT:  Yes, sir.  Yes, sir.  Understood.  Thank you.

Pursuant to Rule 5(f), the United States is ordered to produce all exculpatory evidence to the defendant pursuant to *Brady v. Maryland* and its progeny.  Not doing so in a timely manner may result in serious consequences.  This could include but is not limited to the potential exclusion of evidence, dismissal of charges, and other sanctions which can be imposed by the Court.

Thank you, Mr. Garnett.

MR. GARNETT:  Yes, sir.

THE COURT:  Mr. Schick, good afternoon, sir.  It's good to see you again.

MR. SCHICK:  Good to see you, Judge.

THE COURT:  Mr. Schick, if you could approach the podium with Mr. Lopez.  What we'll do is we'll take up the arraignment first, and then I'll have you return to counsel table for some scheduling matters, and then we'll pick up the detention hearing.

Good afternoon, Mr. Lopez.  Sir, you are here for your arraignment and for a detention hearing.  We're going to take up the arraignment first.  And so for the arraignment, for purposes of the arraignment only, I'm going to ask the clerk of court to place you under oath at this time, okay?

THE CLERK:  Sir, please raise your right hand.

(The defendant is sworn.)

THE COURT:  Good afternoon, sir.  Can you please state your full name?

THE DEFENDANT:  Xavier Louis Lopez.

THE COURT:  Mr. Lopez, how old are you?

THE DEFENDANT:  23.

THE COURT:  And how far did you go in school, sir?

THE DEFENDANT:  I have graduated high school with a diploma, and I have been certified in a couple of courses.

THE COURT:  So you've taken some college-level courses after high school?

THE DEFENDANT:  Well, certification courses, I would say.

THE COURT:  Okay.  Sir, can you read, write, and understand the English language?

THE DEFENDANT:  Yes.

THE COURT:  Are you under the influence of any drugs or alcohol here today?

THE DEFENDANT:  No.

THE COURT:  Are you under the treatment of any doctor for any mental health illness?

THE DEFENDANT:  No.

THE COURT:  Have you received a copy of the indictment in this matter, sir?

THE DEFENDANT: Yes. Although, I have not been allowed to keep it from when I was -- when I was placed in Pamunkey jail, I was -- I have not yet been given a copy to keep in my -- on my property at hand. It was just kept in my property with my -- with my suite clothes.

THE COURT: Ms. Saunders, could you print him a copy of the indictment?

THE CLERK: Yes.

THE COURT: So, Mr. Schick, what we're going to do is we're going to print another copy of the indictment for Mr. Lopez, just so he has a physical copy with him here at the hearing, okay?

MR. SCHICK: Yes, sir, Judge. We have one here as well.

THE COURT: Oh, you have a copy.

Do you have a copy there, Mr. Lopez?

THE DEFENDANT: Yes.

THE COURT: Okay. Ms. Saunders, I think we're okay.

Sir, have you reviewed the indictment with your attorney, Mr. Schick?

THE DEFENDANT: Yes.

THE COURT: Do you understand the charges against you, sir?

THE DEFENDANT: Yes.

THE COURT: Do you understand the maximum penalties

that may apply?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Lopez, do you understand all the questions that I have asked of you this afternoon?

THE DEFENDANT:  Yes.

THE COURT:  Mr. Schick, do you agree with the speedy trial calculation of September the 19th?

MR. SCHICK:  Yes, sir, Judge.

THE COURT:  And have you had a sufficient opportunity to review the indictment with Mr. Lopez prior to appearing before me today?

MR. SCHICK:  Yes, Your Honor.

THE COURT:  And does Mr. Lopez wish that the indictment be read to him or does he waive formal reading of the indictment?

MR. SCHICK:  We'll waive the reading, Judge.

THE COURT:  Madam Clerk, at this time would you please arraign Mr. Lopez.

THE CLERK:  Xavier Lopez, you understand the charges against you in the indictment.  I ask you now:  How do you plead as to Counts One and Two, guilty or not guilty?

THE DEFENDANT:  Not guilty.

THE CLERK:  And do you request a trial by the Court or by jury?

THE DEFENDANT:  Jury.

THE CLERK: Thank you.

THE COURT: Thank you.

Mr. Schick, at this time I'll ask you to return to counsel table with Mr. Lopez. We'll take up some scheduling matters, and then I'll ask the parties about the detention hearing and what evidence each side intends to introduce.

MR. SCHICK: Yes, sir.

THE COURT: Counsel, as you are both aware, instead of selecting a trial date at the arraignment handled by a magistrate judge, Judge Novak requests that a conference call be scheduled with him. At the conference call attended by the attorneys, Judge Novak will set a trial date and other deadlines discussed with the attorneys.

Have we identified a date and time for that conference call with Judge Novak, Ms. Saunders?

THE CLERK: Yes, Judge, July 20th at 3:30.

THE COURT: July 20th at 3:30.

Since Judge Novak will take up the trial date, scheduling, and motions at that time, the Court will not put any motions deadlines on the record at this time.

Mr. Lopez, the next hearing in this matter is a status conference with just the attorneys on July the 20th, 2023, at 3:30 p.m. After that conference call, Mr. Schick will be in contact with you regarding the deadlines and any other dates or hearings scheduled in this matter. Do you

understand, sir?

THE DEFENDANT: Yes.

THE COURT: So, Counsel, now that we've taken up the arraignment, let's turn our attention to the detention hearing.

Let me confirm first with both counsel, we do not -- with regards to the two charges, a presumption of detention does not apply to either charge, correct, Mr. Garnett?

MR. GARNETT: That's correct, Your Honor.

THE COURT: You would agree, Mr. Schick, of course?

MR. SCHICK: Yes, sir, Judge.

THE COURT: Okay. So it would be the government's burden by clear and convincing evidence as to danger to the community and by a preponderance of the evidence regarding flight risk.

Mr. Garnett, what evidence does the defendant -- does the government intend to introduce, if any, here today?

MR. GARNETT: Your Honor, we would call a special agent from the FBI.

THE COURT: Okay. And, Mr. Schick, do you have evidence -- do you have any live testimony you intend to call here today?

MR. SCHICK: Judge, the only evidence that I foresee we may have is the third-party custodian is here present, so we may have some questions for her.

THE COURT:  That's Mr. Lopez's aunt, so you may be calling his aunt.  Okay.

MR. SCHICK:  That's correct, Judge.

THE COURT:  So, Mr. Garnett, go ahead and call your first witness, sir.

MR. GARNETT:  Thank you, Your Honor.

Your Honor, the United States would call Special Agent Rob Wright with the FBI.

THE COURT:  Agent Wright, please come forward, sir.

MR. GARNETT:  Your Honor, I'll note there's an exhibit binder up there in front of you, sir.

THE COURT:  Thank you, Mr. Garnett.

MR. GARNETT:  Yes, Your Honor.

THE COURT:  Mr. Schick, do you have a copy of the exhibits from the government?

MR. SCHICK:  I do, yes, sir, Judge.

THE CLERK:  Sir, please raise your right hand.

ROBERT WRIGHT, GOVERNMENT'S WITNESS, AFFIRMED

DIRECT EXAMINATION

THE COURT:  Yes, sir.

BY MR. GARNETT:

Q    Good afternoon, Agent Wright.  Could you please state your name for the record and spell it?

A    My name is Robert Wright, R-O-B-E-R-T, W-R-I-G-H-T.

Q    And how are you employed, Agent Wright?

Wright - Direct

A    I'm employed by the Richmond FBI Office as a special agent.

Q    How long have you been there?

A    I've been there for almost 12 years.

Q    Have you been involved in an investigation into an individual named Xavier Lopez regarding firearms and explosives possession?

A    Yes, sir.

Q    To be fair, are you the lead agent in that investigation, Agent Wright?

A    I am not.

Q    Is your testimony today, then, based in part on reports and conversations you've had with other individuals and agencies?

A    It is.

Q    So I mentioned earlier Xavier Lopez.  Are you familiar with an individual named Xavier Lopez?

A    Yes, I am.

Q    Do you recognize him here today?

A    I do.

Q    Where do you see him?

A    He's sitting here in the blue jumpsuit.

        MR. GARNETT:  Your Honor, if the record could reflect that the agent has identified Xavier Lopez.

        THE COURT:  Yes.

BY MR. GARNETT:

Q     Do you know where Xavier Lopez, the defendant, was residing in August of 2020, Agent Wright?

A     Yes.  1419 Fort Hill Drive in Henrico.

Q     And speaking very generally for the Court, how would you describe that location?

A     It's a single-family home, single level.

Q     Was the defendant staying there by himself or with anyone else?

A     He lived there with his aunt.

Q     Do you know that individual's name?

A     Her name is Bernadette Haxhaj.

Q     Do you know if there's anyone else -- to your knowledge, is there anyone else in the residence?

A     Not to my knowledge.

Q     And the time frame we're speaking of, Agent Wright, is, essentially, August 2020 to the present.  So during that time frame, is it fair to say it was just the defendant and Ms. Haxhaj in that residence?

A     Yes, sir.

Q     At some point in August 2020, was the defendant arrested by the Henrico County Police Department?

A     Yes, he was.

Q     Do you know the reason for that arrest?

A     He was involved in a vandalism of a vehicle in the

neighborhood.

Q    Do you know exactly how the defendant was accused of vandalizing that vehicle?

A    He was accused of slashing the tires on the vehicle.

Q    Was the defendant carrying anything else besides -- well, I should ask, was the defendant carrying a knife at that time?

A    I believe so, yes, sir.

Q    Was he carrying anything else, to your knowledge?

A    He was carrying what's generally referred to as a Bonnie Blue flag.

Q    Are you familiar with any associations with that particular flag?

A    Yes.  It's generally associated with the Confederacy.

Q    Did onlookers to this vandalism incident call the police?

A    They did.

Q    Did Henrico County Police place the defendant into custody?

A    Yes, sir.

Q    Have you been able to review, Agent Wright, at least some of the body camera video of the arrest and the defendant's transport to state custody?

A    I have.

Q    During his transport, did the defendant assault the police officer who was transporting him?

A    Yes, sir, he did.

Q    Could you describe that incident briefly for the Court?

A    While he was being transported by Henrico PD, he reached for and obtained control of a knife that was in the center console of the police cruiser.  The officer directed him numerous times to put the knife down and subsequently tried to remove Mr. Lopez from the car, at which time he assaulted the officer.

Q    Was the defendant subsequently charged with both felony vandalism and assault on law enforcement?

A    Yes, sir.

Q    On January 7th of 2021, did the defendant plead guilty in Henrico County Circuit Court to the charge of felony vandalism?

A    He did.

Q    Relatively clear-cut, but from that point forward, Agent Wright, was the defendant a convicted felon?

A    Yes, sir.

Q    At that point forward or from that point forward, was he legally prohibited from possessing any kind of firearm?

A    He was.

Q    Legally prohibited from possessing any kind of ammunition?

A    Yes.

Q    What sentence did Mr. Lopez, the defendant, receive in Henrico County Circuit Court?

A    I believe it was five years with four suspended.

Q    As a result of the defendant's plea agreement and later conviction in Henrico County, was the defendant required to turn over all firearms, firearm parts, and ammunition to the Henrico County Police Department?

A    Yes, sir.

Q    Did a family member of the defendant's turn over those materials or related materials in December of 2020?

A    Yes, his aunt.

Q    Before we touch on that inventory, Agent Wright, just some general questions.  What is an AR-15 rifle?

A    An AR-15 is an assault rifle based on a Colt pattern, and it's widely available and used in the civilian sector.

Q    Are there ways that individuals can build their own AR-15-type rifles as opposed to purchasing them from a firearms dealer?

A    Yes, sir.

Q    Before we get there, what is a lower receiver, Agent Wright?

A    A lower receiver on an assault rifle is basically where the magazine well is, the trigger assembly, and usually the buttstock.

Q    If an individual is purchasing a lower receiver from a manufacturer, is that lower receiver fully completed?

A    No.

Q    Is another word for an unfinished lower receiver an 80 percent lower?

A    Yes, sir.

Q    To convert an 80 percent lower into a functioning lower receiver for use in an AR-15 or similar type assault rifle, would the individual purchasing that 80 percent lower need to drill holes in certain locations?

A    Yes, sir.

Q    To drill those holes, would an individual typically use what's known as a jig kit?

A    He would.

Q    What's a jig kit, Agent Wright?

A    A jig kit is basically a kit that contains a pattern.  It allows someone to know where those holes need to be drilled on that unfinished receiver.

Q    To drill those holes, would someone need a device like a drill press?

A    Yes.

Q    What's an upper receiver, Agent Wright?

A    An upper receiver is generally considered to be the barrel and the chamber.  That's the top of the weapon.

Q    So we spoke earlier about the collection and turnover in December of 2020 of a number of items by the defendant's family member to the Henrico County Police Department.  Are you familiar with the materials that were turned over?

A    Yes, sir.

Q    Did those materials include more than 1,000 rounds of 5.56 ammunition?

A    They did.

Q    What kind of rifle shoots 5.56?  Or I should be more specific.  Does an AR-15-type rifle shoot 5.56-millimeter ammunition?

A    Generally, yes, sir.

Q    Did the defendant's family member also turn over 15 AR-style magazines with 30-round capacities?

A    Yes.

Q    Two 40-round AR-style magazines?

A    Yes.

Q    Four AR-15 80 percent lower receivers?

A    Yes.

Q    Three complete AR-style upper receivers?

A    Correct.

Q    One jig kit for AR-15 80 percent lower receivers?

A    Yes, sir.

Q    Four AR-style trigger/handle kits?

A    Yes.

Q    And four AR-style stocks?

A    Correct.

Q    At the time of the defendant's arrest in 2020 by the Henrico County Police Department, Agent Wright, is it fair to

say the defendant had a functional firearms manufacturing

setup at the 1419 Fort Hill Drive residence?

A    I would say so.

Q    Agent Wright, you mentioned that the defendant was

sentenced to a term of 12 months incarceration.  Did he

complete that term on June 28th of 2021?

A    Yes, sir.

Q    Where did he go upon his release?

A    He returned to his residence at Fort Hill Drive.

Q    Was the defendant's aunt still residing there at that

point?

A    Yes, sir.

Q    In the weeks and months following the defendant's release

and return to Fort Hill Drive, did law enforcement observe the

defendant travel to at least three stores with firearm

sections?

A    Yes, sir.

Q    How did the defendant travel to these locations?

A    His aunt took him.

Q    Specifically, the defendant -- did the defendant travel

to a Field & Stream store located in Charlottesville,

Virginia, on July 4th, 2021?

A    Yes, sir.

Q    Did the defendant's aunt drive him there?

A    She did.

Q    Is this approximately a week after the defendant's release from state prison?

A    Yes.

Q    Approximately how far is it from 1419 Fort Hill Drive to the Field & Stream store in Charlottesville?

A    Approximately one hour.

Q    Approximately how many miles, Agent Wright, speaking generally?

A    I would say between 60 and 70 miles.

Q    Have you reviewed surveillance footage of the defendant's visit to the store on that date?

A    Yes, I have.

Q    There's a binder there in front of you, Agent Wright.  If you could take a look at that.

Take a look at Government's Exhibit 1, Agent Wright.

A    Yes.

Q    There's a number of images contained in Government's Exhibit 1.  Could you just flip through those quickly and let me know when you're done.

A    Okay, sir.

Q    Have you previously reviewed Government's Exhibit 1 as well?

A    Yes, I have.

Q    What do you recognize Government's Exhibit 1 to be?

A    It is a visit to the store by Mr. Lopez and his aunt.

Q    Are these surveillance -- or stills lifted from surveillance footage from this store?

A    Yes, they're all from the store surveillance cameras.

        MR. GARNETT:  Your Honor, I would move to enter Government's Exhibit 1.

        THE COURT:  Mr. Schick, any --

        MR. SCHICK:  No objection, Your Honor.

        THE COURT:  Thank you.

        MR. GARNETT:  All right.

        THE COURT:  Those will be received and admitted into evidence as Government's Exhibit 1.

    (Government's Exhibit Number 1 was received.)

BY MR. GARNETT:

Q    So, Agent Wright, looking at the first page --

        MR. GARNETT:  Thank you, Your Honor.

BY MR. GARNETT:

Q    Looking at the first page of Government's Exhibit 1 there, what does that surveillance image capture?

A    It's a picture of Mr. Lopez walking toward the entrance of the store.

Q    Take a look at page 2.  What does that capture?

A    That is a picture of his aunt walking toward the entrance to the store.

Q    Where in that store did the defendant travel to upon entry?

A    The next screenshot is in the gun purchasing area, the gun counter area.

Q    Are we looking at the third picture in that display there, Agent Wright?

A    Yes, sir.

Q    Are there rifles available for sale there at that Field & Stream?

A    There are.

Q    Are there pistols available for sale at that Field & Stream?

A    Yes, sir.  Uh-huh.

Q    Take a look at the next page.  Another image capturing the defendant browsing the firearm section?

A    Correct.

Q    Next image, another photograph?

A    Correct.

Q    I won't belabor the point, but the next two pages, they also capture instances of the defendant looking at firearms?

A    Yes, sir.

Q    Is the defendant's aunt present with him in the firearms section at this time?

A    She is.

Q    Let's take a look at the last page there, Agent Wright. What does that image capture?

A    It is Mr. Lopez and his aunt leaving the store, crossing

into the parking lot.

Q    Did the defendant's aunt also drive him to a Wal-Mart in December of 2021?

A    Yes, sir.

Q    To your knowledge, did the defendant travel to the firearms section of that store on that day?

A    He did.  He went to the sporting goods area.

Q    Did the defendant's aunt also take him to a Cabela's on that same day in December of 2021?

A    Yes, sir.

Q    Did the defendant also travel to the firearms section of that sporting goods store?

A    He did.

Q    Did the defendant tell a clerk at one of those stores that he, that is the defendant, wanted to build a .308 caliber rifle with an 11 and a half inch barrel?

A    Yes, sir.

Q    Did the defendant also tell the clerk that he -- again, the defendant -- wanted to find 168 grain Winchester .308 ammunition to use with that rifle?

A    He did.

Q    Upon the defendant's release and return to that Fort Hill Drive residence, did investigators attempt to learn whether the defendant was active online?

A    They did.  Yes, sir.

Wright - Direct

Q    Did investigators determine whether that Fort Hill Drive residence had internet access?

A    They did.

Q    What internet service provider provided service to that residence?

A    Comcast.

Q    Did Comcast maintain the same IP address for that residence between 2019 and 2022?

A    Yes, sir.

Q    Were investigators able to trace that IP address to several social media accounts?

A    They were.

Q    Were several of those accounts registered under alias names --

A    Yes, sir.

Q    -- that is names other than the defendant's?

A    Yes, they were.

Q    Was one of those alias accounts on the social media platform Gab?

A    It was.

Q    What was the account name?

A    I believe it was Cru54d3r.

Q    Have you reviewed some of the postings made by that account, Cru54d3r, on Gab?

A    Yes, sir.

Q    And were those postings -- I would just say, did those postings express certain views as to certain minorities?

A    Yes, they did.

Q    Certain religious groups?

A    Yes, they did.

Q    Take a look at Government's Exhibit 2, Agent Wright.

THE COURT:  Mr. Garnett, just for clarification of the record, were all the photographs in the binder admitted collectively as Government's Exhibit 1, correct, or is the whole binder being --

MR. GARNETT:  No, I'm sorry, Your Honor.  Just Government's Exhibit 1 consisted of an eight-page --

THE COURT:  The eight photographs you're showing?

MR. GARNETT:  Yes, sir.

THE COURT:  That's your understanding as well, Mr. Schick?

MR. SCHICK:  Yes, sir.

THE COURT:  Okay.  Thank you.

MR. GARNETT:  Looking at Government's Exhibit 2 now, Your Honor.

BY MR. GARNETT:

Q    Agent Wright, are you familiar with Government's Exhibit 2?

A    Yes, sir.

Q    What is Government's Exhibit 2?

Wright - Direct

A    It is a screenshot of a posting from the Gab account in question.

Q    And what is the date of this posting?

A    September 1st, 2022.

Q    And there's a number of highlightings on this posting. To be clear, Agent Wright, were those highlightings made by law enforcement as opposed to the poster?

A    Yes, sir.

        MR. GARNETT:  Your Honor, I would move for the admission of Government's Exhibit 2.

        THE COURT:  Mr. Schick, any objection?

        MR. SCHICK:  Judge, I would object to the foundation unless it has already been laid as to tying this particular account to Mr. Lopez.  I haven't heard that.  Perhaps I just didn't catch it.

        MR. GARNETT:  Your Honor, I believe the agent testified that a certain IP address was assigned to the residence.  That IP address was utilized to access several social media accounts.  One of which was this Gab account.

        THE COURT:  That is my recollection, but if you want to revisit that issue very briefly, Mr. Garnett, to reestablish the connection there.  But my connection was he also testified regarding the IP address.  But, Mr. Garnett, could you revisit that with the agent, please?

        MR. GARNETT:  Yes, sir.

BY MR. GARNETT:

Q    Did the Cru54d3r Gab account, was that account accessed using the IP address assigned to the 1419 Fort Hill Drive residence by Comcast?

A    Yes, sir.

THE COURT:  With that evidence, the Court will overrule the objection.

BY MR. GARNETT:

Q    Agent Wright, looking at this posting, does the poster, Cru54d3r, express their views as to Jewish people?

A    Yes, sir.

Q    What about black people?

A    Yes, sir.

Q    What does the poster say looking about halfway down the page there, Agent Wright, as to what the poster's followers should do if they see police officers come to their residence?

A    "Have no tolerance for cops.  If they come to your house, that's your cue to shoot them.  If you see cops at your white neighbor's house, that's also your cue to shoot them.  If you hear of cops beating up a white man in your area, get together to attack the whole police department."

Q    What does the poster say as to how much respect the poster has for laws, looking at the last posting there, the last highlighted portion?

A    "Have absolutely zero regard for the, quote, 'law and

order,' unquote, of the kike system that hates you."

Q    Did this Gab account poster also provide advice to his followers as to how to manufacture firearms?

A    Yes, sir.

Q    Take a look at Government's Exhibit 3.

THE COURT:  Mr. Garnett --

MR. GARNETT:  Yes, sir.

THE COURT:  -- I think -- did you actually move for the admission of 2?  I guess I overruled the objection.

MR. GARNETT:  Yes, sir, I did.  But I would move again, Your Honor.

THE COURT:  Mr. Schick has noted an objection, which the Court has overruled, so Exhibit 2 will be received and admitted into evidence as Government's Exhibit 2 over the objection of Mr. Schick.

(Government's Exhibit Number 2 was received.)

THE COURT:  Thank you, please proceed, Mr. Garnett.

MR. GARNETT:  Yes, sir.

BY MR. GARNETT:

Q    Agent Wright, are you familiar with Government's Exhibit 3?

A    Yes, sir.

Q    Are these additional postings by the Cru54d3r Gab account?

A    Yes, they are.

MR. GARNETT:  Your Honor, I would move for the admission of Government's Exhibit 3.

THE COURT:  Same objection, Mr. Schick?

MR. SCHICK:  Yes, sir, Judge.

THE COURT:  Okay.  The objection will be overruled. What's been identified as Government's Exhibit 3 will be received and admitted into evidence, marked as Government's Exhibit 3 over the objection of the defendant.

(Government's Exhibit Number 3 was received.)

BY MR. GARNETT:

Q    Agent Wright, taking a look at Government's Exhibit 3 there, what is the poster -- he's offering some helpful tips to, quote, "How to have a proper organization without opening yourself up to glownigger entrapment schemes, end quote." What does the poster tell his followers they should do?

A    The poster writes, "All real weapons should be built, not bought.  This can be done with a 3D printer and a parts kit, both of which can quite easily be bought untraceably."

Q    And looking at this -- it's not highlighted, but what does the poster say about tactics that individuals can use to avoid law enforcement detection?  Please keep reading that sentence.

A    Yes, sir.  "Especially if everyone in the group holds mail for each other, and any debit cards used are purchased with cash and are registered under a pseudonym when

Wright - Direct

necessary."

Q    That's fine.  Thank you, Agent Wright.

Looking at the second posting there, Agent Wright.  Can you read -- I should say, does the poster discuss whether or not being a convicted felon is a good reason not to carry a firearm?

A    Yes, sir.

Q    Can you read that post for the Court?

A    The post reads:  "No, being a convicted felon is not at all a valid excuse for remaining unarmed.  Stay strapped or get clapped.  If you don't have a gun yet, at least acquire the means to make one.  Parts kits are everywhere and 3D printers are pretty cheap."

Q    And, Agent Wright, there's dates -- the first posting --

MR. GARNETT:  Excuse me, Your Honor.

BY MR. GARNETT:

Q    The first posting is October 7th, the 7th is -- the second is October 5th.  What years were these postings made?

A    That would be 2022.

Q    Excuse me.  Take a look at Government's Exhibit 4, Agent Wright.  Are you familiar with Government's Exhibit 4?

A    Yes, sir.

Q    What is Government's Exhibit 4?

A    It's another screenshot of a posting on the Gab account we discussed previously.

Q    What's the date of this posting?

A    October 4th, 2022.

MR. GARNETT:  Your Honor, I would move for the admission of Government's Exhibit 4.

THE COURT:  Same objection, Mr. Schick?

MR. SCHICK:  Yes, sir, Judge.

THE COURT:  The Court will overrule the objection and receive this document into evidence as Government's Exhibit 4.

(Government's Exhibit Number 4 was received.)

BY MR. GARNETT:

Q    Could you go ahead and read the first full sentence -- I'm sorry, the first two sentences of that posting, Agent Wright?

A    "This is why we should always be armed.  Raid a military or police armory if you have to.  Go full Lord of War but for white people only, if necessary.  Manufacture pipe bombs using match heads or mix acetone and either 35 percent peroxide or styrofoam."

Q    Did investigators learn during the course of their investigation as to whether or not the defendant was making online purchases?

A    They did.

Q    To make those purchases, was the defendant utilizing aliases?

A    Yes, sir.

Wright - Direct

Q    During this time frame, 2021, 2022, do you understand the defendant to have any kind of gainful employment?

A    I am not aware of any, no, sir.

Q    Specifically, did investigators learn that the defendant purchased online burglary tools?

A    They did.

Q    Did they learn whether he purchased a 9-millimeter handgun build kit?

A    They did.

Q    Okay.  Have you reviewed a number of the records related to those online transactions?

A    Yes, sir.

Q    Was the cost associated with just three of those transactions cumulatively more than $600?

A    They were.

Q    Where did the defendant direct these online purchases to be shipped to?

A    1419 Fort Hill Drive.

Q    Did Henrico County Police Department obtain a search warrant for the defendant's residence in November of 2022?

A    Yes, sir.

Q    Did they execute that search warrant on November 13th of 2022?

A    They did.

Q    As part of that search warrant execution, did

investigators take various photographs of the interior and exterior of that residence?

A    Yes, sir.

Q    Have you reviewed a number of those search warrant photographs?

A    I have.

Q    Take a look at Government's Exhibit 5, Agent Wright. Have you previously reviewed Government's Exhibit 5?

A    Yes, sir.

Q    What are the images in Government's Exhibit 5?

A    They are photographs from the exterior, interior, and premises of 1419 Fort Hill Drive.

Q    And were those photographs taken during the execution of the search warrant on November 13th, 2022?

A    Yes, sir.

        MR. GARNETT:  Your Honor, I would move for the admission of Government's Exhibit 5.

        THE COURT:  Mr. Schick, any objection?

        MR. SCHICK:  No objection, Your Honor.

        THE COURT:  All right.  The photographs will be admitted -- received and admitted into evidence as Government's Exhibit 5.

    (Government's Exhibit Number 5 was received.)

        MR. GARNETT:  Thank you, Your Honor.

BY MR. GARNETT:

Q    Agent Wright, you mentioned that you've had the opportunity to become familiar with 1419 Fort Hill Drive in the course of this investigation.  Do you recognize the residence depicted there on the first image?

A    Yes, sir.

Q    And what is that?

A    It is 1419 Fort Hill Drive.  It's a street view of the house.

Q    Okay.  We're going to take a quick walk through of these photographs, Agent Wright.  Turn to page 2.  Is there a small shed in the backyard of that residence?

A    Yes, sir.

Q    Is that a photograph of that shed?

A    It is.

Q    Turning to page 3.  What does this image depict, Agent Wright?

A    This is the interior of the shed.

Q    Looking at the interior of the shed there, Agent Wright, do you see a shelf on the right-hand side of the image?

A    Yes, sir.

Q    And do you see two bottles there on the left-hand side or the two furthest left objects on that shelf?

A    I do.

Q    Have you previously reviewed those devices or looked at those devices?

A    Yes, I have.

Q    Can you describe those devices for the Court?

A    They are what appear to be bottles with cloth wicks coming out of the top of them, and they're filled with liquid.

Q    In your training and experience, Agent Wright, when you observed those bottles, did they resemble anything to you?

A    Yes.  I would assume that they are some sort of Molotov cocktail-type device.

Q    What's a Molotov cocktail?

A    A Molotov cocktail is a container that's filled with an incendiary liquid, and it is designed to have a wick on it so that when the container is thrown and it busts or opens, the flammable material inside basically explodes and burns whatever it's in contact with.

Q    Were these items collected and later provided to the FBI laboratory in Quantico?

A    Yes, sir.

Q    Did the FBI lab determine these devices contained both gasoline and polystyrene?

A    They did.

Q    What is polystyrene, Agent Wright?

A    Polystyrene is a foam-type substance that would have been added to probably thicken a liquid and act as a jelly-type material that would adhere to objects that were within the explosive area.

Q    Is polystyrene a kind of styrofoam then?

A    Yes, sir.

Q    And you mentioned -- I think you said flaming jelly; is that right?

A    Yes.  Basically, yes.

Q    Would the mixture function essentially as a kind of napalm?

A    Yes, sir.

Q    Probably an obvious question, would adding styrofoam to a Molotov cocktail's gasoline mixture make that device more lethal?

A    I would say so, yes, sir.

Q    Let's go back inside the residence here, Agent Wright, looking at the fourth image.  What's the vantage point of this fourth image from which this photograph was taken?

A    This is a photo from the hallway of Mr. Lopez's bedroom.

Q    And do you see the object hanging there on the wall?

A    I do.

Q    What do you recognize that to be?

A    I would refer to it as a Nazi banner with a swastika.

Q    Take a look at the next image.  Did investigators locate a blue book bag within that bedroom?

A    They did.

Q    I should take a step back.  Do you understand that bedroom to have been the defendant's bedroom?

A    Yes, sir.

Q    Did investigators look inside that blue book bag?

A    They did.

Q    Let's turn to the next image.  Did investigators locate a box of ammunition within that book bag?

A    Yes, they did.

Q    Is that a photograph of that box of ammunition?

A    Yes, it is.

Q    Turn to the next page.  Is that another picture of the same box just taken for evidence collection purposes?

A    It is.

Q    What caliber ammunition is that Hornady Critical Defense box of ammunition?

A    I know it to be a 9-millimeter caliber from a sister photo.

Q    Take a look at the next image.  Did investigators also locate a number of devices within that blue book bag?

A    Yes, sir.

Q    Is this one of those devices?

A    It is.

Q    What is affixed to the bottom right-hand side of that bottle, Agent Wright?

A    It appears to be an all weather or extreme weather match or hurricane-type match.

Q    And is a hurricane match, does the flame that it burns

with, does it resemble the kind of sparkler that a child might

wave around on the 4th of July?

A    Yes, sir.

Q    Is it designed to withstand high winds?

A    It is.

Q    Exposure to water?

A    Correct.

Q    Take a look at the next image.  Is this a photograph of

the devices located within the book bag found in the

defendant's bedroom?

A    Yes, sir.

Q    In your training and experience, Agent Wright, what do

you recognize these to be?

A    I would believe that they were improvised incendiary kind

of devices, sir.

Q    Were these devices collected and provided to the FBI

laboratory in Quantico?

A    Yes, they were.

Q    Did the FBI laboratory confirm that these devices

contained both gasoline and polystyrene as well?

A    They did.

Q    Regarding that FBI lab analysis, Agent Wright, as to each

of the eight devices we've talked about here today, did the

FBI laboratory conclude that each of those devices was either

a fully assembled or partially assembled improvised incendiary

device?

A    Yes, sir.

Q    Did the FBI lab search those devices for DNA?

A    They did.

Q    Did they recover the defendant's DNA from six of those devices?

A    Yes, sir.

Q    Did they also inspect those devices for latent fingerprints?

A    They did.

Q    Did they recover the defendant's fingerprints from three of those devices?

A    They did.

Q    Let's go back into the residence, Agent Wright, and turn to the next photo.  What room of the house is this photo taken in?

A    This is still Mr. Lopez's bedroom.

Q    Do you recognize the device contained there on the desk?

A    It appears to be a 3D printer.

Q    Did agents find 3D printed material, Agent Wright, within the defendant's bedroom?

A    Yes, they did.

Q    Let's turn to the next page.  Did agents -- or investigators, I should say, did they recover this 3D print attempt from the defendant's bedroom?

A    Yes, sir.

Q    What do you recognize that an attempt to be or an attempt to print?

A    They appear to be an attempt at a lower receiver for a handgun.

Q    Looking at the next image, Agent Wright, is that the same handgun attempt just taken for evidence collection purposes?

A    They are.

Q    And then the next image, is that just the reverse side of the handgun grip?

A    That's correct.

Q    Looking at the last image, Agent Wright, what is that?

A    This is what I would call a slide that belongs to the upper receiver of a handgun.

Q    Was that slide to a handgun part of the 9-millimeter build kit purchased?

A    It was.

Q    By the defendant?

A    Yes, sir.

Q    Was the defendant arrested by state authorities following the execution of the search warrant, Agent Wright?

A    He was.

Q    At some point thereafter, did federal agents interview the defendant at Henrico County Jail?

A    Yes, they did.

Q    During that interview, did the defendant deny possessing the 9-millimeter ammunition found in the book bag?

A    No.

Q    Did the defendant deny knowledge of the Molotov cocktails?

A    No.

Q    Did the defendant respond to a question about those devices by claiming that he had those devices because he was interested in their historical significance?

A    That's my understanding, yes, sir.

Q    Did investigators also speak with the defendant on November 13th, 2022, during the execution of the state search warrant?

A    Yes.

Q    During the interview, did they ask him for officer safety purposes whether the devices that they had located were at least somewhat stable, that is, would they explode at any time?

A    Yes, sir.

Q    Did the defendant tell the investigators that they were not designed to just explode?

A    He did.

Q    Did the defendant indicate to investigators during that interview approximately how long he had been in possession of those devices?

A    I believe he stated months.

Q    During the search warrant execution on November 13th, did investigators search the entire residence?

A    Yes, sir.

Q    Did they search a bedroom belonging to the defendant's aunt, Bernadette Haxhaj?

A    They did.

Q    During that search of that bedroom, did they recover a letter from the nightstand?

A    Yes, sir.

Q    Was that letter contained in a mailing envelope?

A    It was.

Q    According to the mailing envelope, who is the drafter of that letter?

A    Xavier Lopez.

Q    Take a look at Government's Exhibit 6, Agent Wright. Have you previously reviewed Government's Exhibit 6?

A    Yes, sir.

Q    And what is Government's Exhibit 6?

A    It is an envelope and the letter contained within from Mr. Lopez at the Henrico County Jail.

Q    Is this a letter that was recovered from Ms. Haxhaj's bedroom nightstand?

A    Yes.

         MR. GARNETT:  Your Honor, I would move for the

admission of Government's Exhibit 6.

MR. SCHICK:  No objection, Your Honor.

THE COURT:  The letter identified will be received and admitted into evidence as Government's Exhibit 6.

(Government's Exhibit Number 6 was received.)

BY MR. GARNETT:

Q    And looking at the return address on this envelope, Agent Wright, who's the sender?

A    Xavier Lopez.

Q    What's the address provided by Xavier Lopez?

A    Henrico County Jail East.

Q    And what is the date of mailing, looking just to the left of the stamp?

A    28 May 2021.

Q    To your knowledge, Agent Wright, was the defendant, in fact, incarcerated at Henrico Jail East during that time?

A    He was.

Q    Is 28 May 2021 approximately one month before the defendant's release?

A    Yes, sir.

Q    If we could look at page 2 or I should say the first page of the letter.  To be clear, Agent Wright, are the highlighted portions of the letter, were the highlightings found in the letter or were they added by law enforcement later?

A    They were added later by law enforcement.

Q    Could you read the first highlighted portion for the Court?  Actually, I'm going to take a step back.  Who's the letter addressed to, the very top?

A    It is addressed --

Q    Oh, I'm sorry.  The first page of the letter, Agent Wright.

A    Yes, sir.  It's addressed to Bernadette Haxhaj.

Q    Thank you.

     And then looking at the letter itself, the first page, who is the -- who's the letter addressed to at the top of that first page?

A    Dear Bernadette.

Q    Could you read the first highlighted portion for the Court?

A    "Our government is evil.  Enough so that there can be no peaceful coexistence between God's plan and following the law."

Q    Can you read the second highlighted portion?

A    "You say that you'll always have a place for me in your home, but when you also said no guns were allowed, I knew that to be a lie.  Ultimately, you did allow me to have the rifle."

Q    And the next highlighted portion.

A    "The reason I will not be caught dead without a gun is the same reason our Lord said, quote, 'If you don't yet have a sword, sell your cloak and buy one,' closed quote."

Wright - Direct

Q    Agent Wright, as of the date this letter was mailed to Bernadette Haxhaj, was the defendant a convicted felon?

A    Yes, sir.

Q    Turn to page 2.  Can you read the bottom highlighted portion beginning with "it must"?

A    "It must be said that unless I am able to build guns, explosives, and other forms of weaponry and store them in my room without fear of the law finding out about it from you, I cannot fully trust in anything you say or do."

Q    Turn to the next page.  And looking at the very bottom portion here, can you start out reading that sentence, and then we'll turn to the next page?

A    "All that needs to be done is for us to truly unite in Christ Jesus and make total war against the Satanic occultist government and the Zionist devil worshiping bankers who control it, and the Lord God will give us victory."

Q    And looking at the bottom of the page, sort of the laundry list of human beings.  Can you read off the next quotation?

A    "Jews, liberals, communists, degenerates, Zionists, progressives, capitalists, globalists, and Green Party PETA-type environmentalists are the greatest enemies of God and the primary representatives of the devil himself in the spotlight and everyday life.  Learn to spot them and how to destroy them."

Wright - Cross

Q    And turn to the last page, Agent Wright.  How does the defendant sign this letter?

A    Xavier Lopez, 21st century crusader.

MR. GARNETT:  Thank you, Agent Wright.  That's all the questions I have.  Please answer any questions that defense counsel or the Court may have for you.

THE COURT:  Cross-examination, Mr. Schick.

MR. SCHICK:  Yes, sir, Judge.

CROSS-EXAMINATION

BY MR. SCHICK:

Q    Agent Wright, after my client was found guilty of the Henrico County destruction of property, law enforcement reached out to his family for them to turn over certain items, correct?

A    Yes, sir.

Q    And they, in fact, turned over those items as directed, correct?

A    That's correct.

Q    All right.  And that was my client's aunt who participated in that; is that right?

A    Yes, sir.

Q    All right.  And then you referenced an event as far as an allegation of assault on a police officer.  My client was not found guilty of that conduct, correct?

A    My understanding is, as part of his plea deal, he -- they

dropped that charge.

Q    It was dropped?

A    Yes, sir.

Q    Yes, sir.

A    That's correct.

Q    And then the shopping trips that you've referenced here and testified to as to Field & Stream, nothing was purchased at that particular store, correct?

A    Not to my knowledge, no, sir.

Q    And Field & Stream carries a number of items, not just firearms and hunting gear, but also camping and sleeping bags and all sorts of items, correct?

A    That's correct, sir.

Q    The same applies to Wal-Mart, correct?  Nothing was purchased at the Wal-Mart?

A    Not to my knowledge, no, sir.

Q    And Cabela's, the same situation, nothing was purchased there; is that right?

A    That's correct, to my knowledge.

Q    And I apologize if this is a simplistic question, but how exactly do you determine those particular posts on social media were written by this gentleman?  I understand you've testified as to the IP address --

A    Yes, sir.

Q    -- but can you expand on that?

Wright - Cross

A    We knew from earlier in the investigation that he had used Gab before, so --

Q    When you say "Gab," what do you mean Gab?

A    The platform that was referenced in those screenshots.

Q    That's a platform used by a number of individuals; is that correct?

A    I assume so, yes, sir.

Q    Okay.

A    Yeah.  And that particular account was tied to the IP address that was associated with 1419 Fort Hill Drive.

Q    Very well.  Very well.

And the 3D printer that you have put forth photos of today, that was -- allegedly created these two pieces of plastic that were there in the shape of a firearm; is that correct?

A    That was the belief, yes, sir.

Q    All right.  And the testimony that you've given about these kits and tools and things of that sort, do you have any specifics as to whether those were purchased before my client was found guilty in Henrico County, or do you have that information?

A    The kits on the original search warrants, sir, that we talked about, or the ones that we talked about with the exhibits?

Q    You've laid so much out here today.

A    Right.

Q    It's quite a bit to try to parse through.  Do you have the dates or do you not have the dates of the purchase?

A    I believe the dates are on the purchase receipts for those items.  I don't have them in front of me.

Q    Very well.

A    Yes, sir.

Q    Were they before his conviction or not, or do you just not know?

A    I'm not clear.  I believe they were after, but I'm not clear.

Q    You're not sure?

A    Yes, sir.

Q    All right.  Very well.

MR. SCHICK:  I don't have anything else, Judge.  Thank you, sir.

THE COURT:  Any redirect?

MR. GARNETT:  No redirect, Your Honor.

THE COURT:  Agent Wright, thank you for being here today, sir.  You can return to your seat at this time.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Does the government have any additional evidence to present?

MR. GARNETT:  No, sir, just argument.

THE COURT:  Okay.  Mr. Schick, does the defense have

any evidence to present by way of testimony or proffer here today?

MR. SCHICK: Judge, I would prefer to go by proffer, because everything that I would ask my client's aunt is already laid out in the pretrial report, unless the government has some objection.

THE COURT: Any objection to a proffer, Mr. Garnett?

MR. GARNETT: No, sir. That's fine.

THE COURT: Mr. Schick, you can proceed with your proffer.

MR. SCHICK: Yes, sir, Judge.

Essentially, Judge, what we're asking the Court to consider is to have my client's aunt serve as a third-party custodian. As laid out in the pretrial services report, she lives here locally in Henrico County. His aunt works for the SCC here in Richmond. She works remotely three days a week, so would be home in the household most of the time. She also shared with the pretrial services worker that she has some ability to expand upon that, may be able to work remotely even more than just the three days.

As to my client and his background and things of that sort, what we would proffer, he's 23 years of age. As laid out in the pretrial report, he has a job opportunity where his aunt has been in contact with a local tree cutting service where they may have some employment opportunities, as well as

the city of Richmond.  There may be an employment opportunity there as well.

As far as my client's prior record, you've heard about it essentially through the testimony today.  You have the destruction of property in Henrico County.  There was one other matter that was initially assault and reduced to trespass, then dismissed, is the way I read the pretrial report.  Most importantly, there's no failures to appear of any kind.  My client has significant ties here to this community.  He's lived here since 2018, has significant family support here with his aunt, who's here in support of him today.  We would suggest to the Court that he is not a flight risk due to his lack of failures to appear and his ties to this community.

As to whether he is a danger to the community, I understand that that may be more of what we're really here about.  We would suggest to the Court that he has no history of any violence as far as his criminal record.  As to the evidence put forth in the binder today and the testimony of the agent, there's quite a bit of rhetoric put out there, but as far as actual conduct by my client, we would suggest to you that there's not conduct of violence.  There's certainly alleged conduct of inflammatory statements made on chat sites or internet sites, things of that nature.

We would ask Your Honor to consider releasing my

client on some very strict pretrial conditions, perhaps home electronic monitoring or something of that nature while this matter is set for trial.

THE COURT:  Thank you, Mr. Schick.

Mr. Garnett.

I know Mr. Schick's proffer and argument kind of overlapped a little.  Mr. Schick, I'll certainly provide you an opportunity to address anything Mr. Garnett may raise by way of argument.

MR. SCHICK:  Thank you, Judge.

THE COURT:  Yes, sir.

MR. GARNETT:  Thank you, Your Honor.

Your Honor, obviously as Your Honor knows, it's the government's burden to establish there's no condition or a combination of conditions that can secure the defendant's return to court, that is his appearance back before Judge Novak and the safety or the safety of the community.  Your Honor, I'd submit that the evidence that was submitted here today establishes overwhelmingly that no condition or combination of conditions can satisfy either of those two considerations.

Judge, looking first at the third-party custodian, I'll note that pretrial services did not find her to be a suitable custodian.  Judge, I would wholeheartedly concur with that assessment.

Looking first at the proposed plan submitted, it's not feasible, Your Honor.  The defendant would presumably work as a tree cutter, which is one of the most mobile professions out there.  He would be going to different spots on a daily basis.  It would require the defendant to change, again, daily work locations.  The defendant's aunt would need to wholesale shift her employment from what I understand to be -- I don't want to misquote -- three days a week at work, and then two days a week hybrid.  She would need to be there with the defendant every moment of every day, Your Honor.  I don't see any representation that the State Corporation Commission is inclined to provide her that kind of leeway.

But looking more concretely, Judge, at the defendant's proposed third-party custodian, starting off in the most benign fashion, Judge, she's a likely government witness by virtue of the fact that we're talking about a very small dwelling place occupied by two people, and the charges against the defendant deal with possession of various materials.  So confirming that the other person in the residence was not, in fact, in possession of those materials, and was not the actual owner of those materials is obviously going to be something that would come up at trial or could come up at trial.

But more to the point, Judge, the defendant's aunt has been just shy of an aider and abettor throughout this

investigation.  Within a week of his release, she drove him more than 60 miles to a Field & Stream store in Charlottesville, where they went directly to the firearms counter.  I can't think of any reasonable reason, Judge, to take your just released felon nephew to a firearm store and allow him to salivate over pistols and rifles for some time.

Judge, looking at the other items that have come before the Court, the charged conduct in this offense took place within the confines of a small residence occupied by the defendant and his aunt.  In other words, Judge, the defendant possessed eight destructive devices.  He may well have built them there.  He possessed ammunition.  All of this took place under the presumably watchful eye of the defendant's aunt before.  That all happened before.  Returning him to the same location that he used to possess ammunition and destructive devices is just not a feasible solution, Your Honor.

The aunt, the defendant's aunt, Judge, knew about his violent ideological views, or at least his ideological views, because there was a Nazi flag hanging on the wall of the bedroom facing the hallway doorway, which the defendant's aunt would presumably have to walk by on a regular basis.  The defendant's aunt knew about his desire to acquire weapons, Judge.  She knew about his desire to -- I don't want to misquote the defendant here -- she knew that, quote, "It must be said that unless I am able to build guns, explosives, and

other forms of weaponry and store them in my room without fear of the law finding out about it from you, I cannot fully trust in anything you say or do."

Judge, the defendant was charged with building explosives and storing weaponry and ammunition and those explosives in his bedroom.  He told his aunt what he was going to do a month before he was released from prison, and then he did it, Your Honor.  And the defendant's aunt did not notify law enforcement that her nephew had a minor firearms and explosives factory in his bedroom.

Judge, there's no way the Court can have any kind of confidence the defendant's aunt is going to be a conscience and wholly involved third-party custodian.  So I'd submit that I agree with pretrial services' recommendation that she is not, in fact, a suitable custodian.

Turning then, Your Honor, to the defendant himself and looking at the detention factors that are enumerated in 18, United States Code, Section 3142.  The first of those, Judge, directs the Court to consider the nature and circumstances of the offense charged.  And the statute specifically directs the Court to consider whether the offense charged includes the possession or the use of a destructive device, which is precisely what the defendant is, in fact, charged with in Count Two of the indictment.  The defendant possessed eight incendiary devices, Your Honor.  They were

devices that contained both gasoline and polystyrene, which makes those devices more lethal, not that a Molotov cocktail is a good thing, but adding styrofoam to it makes it even worse. There's no good reason, Judge, to possess and store Molotov cocktails. It's not a form of art. It's not hanging a Monet. They're destructive devices and they're treated as such by U.S. Code.

Looking at the weight -- I should actually take note, Judge, that I don't want to lose track of Count One. It's a serious offense as well. I think it's worth noting, Judge, that the ammunition the defendant possessed matched the caliber of handgun kit that he had purchased, and that he was trying to print a 3D lower receiver to match that receiver kit. In other words, Judge, the defendant had one part of the puzzle that he would need to hurt people, and he was busy assembling the others.

Looking at the weight of the evidence, Judge, factor (g)(2), I know there are many courts that have said that we're not to consider that as one of the most important factors, but the weight of the evidence here against the defendant, Your Honor, is overwhelming. The devices were found in a shed on his property and in his bedroom. His DNA was found on a number of those, his fingerprints were found on a number of those, and he admitted to possessing those devices.

Looking at the defendant's history and

characteristics, factor (g)(3), the defendant has a mental health history, Judge, that includes at least one suicide attempt. He is unemployed. And I'll draw, Your Honor, this maybe ropes back a little bit to the third-party custodian question, the defendant was unemployed during this time frame, yet was able to make online purchases totaling more than $600, including purchases of an online -- or an online purchase of a firearm kit. But more to the point here, Judge, for (g)(3), he was unemployed, he is unemployed, and he is entirely financially relying on his aunt according to the pretrial services report.

Finally, Judge, looking at his criminal history, it is brief. I would submit it's also violent. It involved the use of a knife to slash the tires on a neighbor's vehicle and assault on a police officer. I understand that he was not convicted of that offense. However, Agent Wright testified that he watched body cam video that clearly depicted that assault.

Finally, Judge, I think most importantly here, the fourth factor the Court is to consider in weighing detention, whether detention is appropriate, is the nature and seriousness of the danger to the community the defendant's release would pose. Judge, the defendant possessed eight incendiary devices. They have only one purpose. He is a convicted felon who possessed ammunition that matched the kind

of firearm he was trying to build. We do not have to speculate as to why he built destructive devices. We do not have to speculate as to why he possessed ammunition, Judge, because the defendant has explained that to us in a letter he sent to his aunt and in postings that he made on that Gab account, Judge. He described a lengthy list of people that he wanted to destroy. It probably includes most of the people in this courtroom, Judge, by far in one category or the other. He described to his followers on that Gab account, he explained to his followers how to build untraceable guns, how to assemble pipe bombs. He described how to assemble the parts, how to acquire the parts needed for firearms. He explained how to acquire those parts while avoiding law enforcement detection.

Judge, the defendant is explicit about how he feels about the law, that it's not that he just doesn't respect it, Your Honor, he thinks that disobeying it, that flouting it is a noble and necessary thing to do in this ideological pursuit that only he can probably elaborate on for the Court.

So, Your Honor, I'd submit that there's overwhelming evidence that there is no condition or combination of conditions that can ensure the defendant's appearance or the safety of the community, and we, therefore, ask that he be detained pending trial.

THE COURT: Thank you, Mr. Garnett.

Mr. Schick.

MR. SCHICK: Judge, I'll be brief. I'll rely primarily on my earlier statements and comments. The only thing I would say is I believe the government's assertion that this is some sort of manufacturing facility over at this residence in Henrico County is not consistent with the evidence that you have before you. You have pictures of six to eight soda bottle or juice bottles where apparently an individual poured gasoline. And so to assert that his aunt knows that there's some sort of factoring going on over there, it's just not consistent with what we have before us. So to make those kind of assertions or allegations, I would suggest to you is not where we are and not what the facts are before this court.

And then as far as the 3D printer, again, there's no reason to believe as to why the aunt should know or not know as to what may or may not have happened with the 3D printer. So I think that's just the government making assertions that just are not established by the evidence before you.

But as to the overriding issue as to whether a third-party custodian, if the Court needs to hear from the aunt, we can certainly have her testify as to her work and the flexibility and things of that sort, but I believe where we really are is to whether or not this gentleman is a threat to the community. And there's certainly the rhetoric, which is a

concern and we recognize that is a concern, but when we compare the rhetoric to the actual conduct and the actual record of Mr. Lopez, I would suggest to you that it's not established that he's a danger to the community.

THE COURT: Thank you, Mr. Schick.

Mr. Lopez, can you please stand, sir?

Mr. Lopez, the issue before the Court is whether there are conditions or a combination of conditions that the Court can impose to reasonably ensure your appearance and the safety of the community. Based on the nature of the charges, the burden rests with the government by clear and convincing evidence as to danger to the community or others and by a preponderance of the evidence on risk of flight.

Mr. Lopez, I'm going to review the factors the Court is required to consider, but I want to let you know that I believe the government has met its burden here today as to both flight risk and to danger to the community.

Pursuant to 18, United States Code, 3142(g), the Court is to consider the following factors:

The nature and circumstances of the offense charged, including whether the offense involves firearms, explosives, or destructive devices. The Court would find that that would weigh in favor of detention, Mr. Lopez.

The weight of the evidence against the person, as Mr. Garnett points out, of all the factors the Court is to

consider, the Court should give -- place the least amount of emphasis on that factor, but the Court still finds that that factor would weigh in favor of detention.

The history and characteristics of the person, Mr. Garnett touched on one issue and the evidence here today did not so the Court is relying on the pretrial report and the information contained on the pretrial report, but the Court has serious concerns about Mr. Lopez's mental health history, specifically as detailed in the pretrial report.

Mr. Schick points out the community ties, but the Court would find, even if it could get to this point in the analysis, the Court would find that the aunt is not a suitable third-party custodian based on the evidence presented here today regarding visits to Field & Stream and other stores. And the evidence with regards to what was present in that house and in that shed, and that certainly would not be a suitable residence to release Mr. Lopez to.

So the Court would find that the history and the characteristics of Mr. Lopez would weigh in favor of detention.

Lastly, the Court is required to consider the nature and the seriousness of danger to any person or the community that would be posed by the person's release. This factor specifically weighs in favor of detention. The concerns here are raised with the social media posts. The evidence that I

have in front of me here today is the existence of -- and confirmation of eight explosive devices, many of which either had the defendant's DNA or fingerprints on them, and the 3D printing or attempts at printing of firearms.  Couple that with the rhetoric referenced by Mr. Schick and, unfortunately, the Court finds that that raises very serious concerns regarding the danger that Mr. Lopez could pose to the community and to others.  So for that reason the Court would find that the government has met its burden by clear and convincing evidence as to danger to the community.

Having made those -- having undergone that analysis of the 3142(g) factors, the Court would make the following findings:

That Mr. Lopez poses a risk of nonappearance based on the mental health issues discussed on the record, based on pretrial, probation, and parole, supervised release status and compliance.  The lack of verifiable legitimate employment is an issue for the Court.  The fact that evidence here today was that large purchases were being made without any verification of any legitimate employment is concerning to the Court, but the Court also takes into account with regards to the risk of nonappearance the evidence presented here today regarding Mr. Lopez's views on authority and specifically law enforcement.  And while the charge was ultimately dismissed, evidence was presented here today regarding the review of body

cam footage where he assaulted law enforcement.

So the Court finds those are all reasons that the defendant poses a risk for nonappearance.

As to assessment of danger, the Court finds that he poses a risk of danger based on the nature of the instant offenses; his prior arrests and convictions, which involve a domestic situation; paramilitary activity, and I'll hold off in going as far as terrorism, but certainly military activity; apparent mental health issues; pretrial, probation, parole, supervised release status and compliance and criminal activity while under supervision.  The Court also believes the defendant poses a risk of danger based on his affiliation or expression of extremist ideologies including white supremacy ideologies.

So for those reasons, the Court will find the government has met his burden.

And, Mr. Lopez, for those reasons, the Court will find that you need to be held in custody pending further proceedings in this matter.

Is there anything further we need to take up, Mr. Garnett?

MR. GARNETT:  No, Your Honor.  Thank you.

THE COURT:  Mr. Schick, anything further, sir?

MR. SCHICK:  No, sir.

THE COURT:  I want to thank both counsel for their

U.S.A. v. Lopez - 7/14/2023

arguments, for the production, efficient production of the evidence.

And in terms of the aunt, ma'am, thank you for your willingness to serve in this role as third-party custodian. However, the Court is required to consider these factors in 3142(g) and the Court believes that the 3142 factors mandate that Mr. Lopez be held in detention pending further proceedings in this matter.

At this time, sir, I'll need to remand you to the custody of the United States Marshal.

THE CLERK:  All rise.  This Court stands adjourned.

(Court adjourned at 3:30 p.m.)

CERTIFICATE

I, Melissa H. Custis, certify that the foregoing is a correct transcript from the electronic record of proceedings in the above-entitled matter.

/s/  Melissa H. Custis, RPR          Date: 8/23/2023