# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>XAVIER LOPEZ,<br><br>*Defendant*. | Case No. 3:23-cr79-DJN |

### GOVERNMENT'S TRIAL MEMORANDUM
### AND NOTICE OF INTENT TO INTRODUCE *RES GESTAE*
### AND EVIDENCE OF OTHER ACTS PURSUANT TO RULE 404(b)

The United States of America, by Jessica D. Aber, United States Attorney, and Thomas A. Garnett and Peter S. Duffey, Assistant United States Attorneys, hereby submits its trial brief and provides notice to defendant Xavier Lopez of the government's intent to introduce evidence at trial of the defendant's other acts pursuant to *res gestae*, as well as pursuant to Federal Rule of Evidence 404(b) in order to prove his motive, intent, plan, preparation, knowledge, identity, and absence of mistake or accident in reference to the offenses charged in the Indictment.

## I.  Facts of this Case

The defendant was indicted by an Eastern District of Virginia grand jury on June 22, 2023. The grand jury returned a two-count indictment against the defendant, charging him in Count One with Possession of Ammunition by Convicted Felon (in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)) and in Count Two with Possession of a Destructive Device (in violation of 26 U.S.C. §§ 5841, 5845, and 5861).

The charges in the indictment stem from a search of the defendant's residence in Henrico, Virginia, within the Eastern District of Virginia, on November 13, 2022, pursuant to a state search

warrant issued by the Henrico County Circuit Court. At this time, the defendant—Xavier Lopez—was a convicted felon, having been adjudged guilty of the commission of Felony Vandalism (in violation of Virginia Code § 18.2-137) in Henrico County Circuit Court on January 7, 2021; sentenced to a term of five years' imprisonment (four years suspended); and released from state prison upon completion of the active portion of that sentence on June 28, 2021.

State law enforcement officials sought and obtained the search warrant in November 2022 after accumulating evidence that indicated the defendant was intent on building firearms in his residence and taking concrete steps to consummate that goal. That evidence included:

(1) Online social media postings emanating from the defendant's residence that described the poster's explanations of how to construct untraceable firearms through the use of 3D printers and the purchase (using pseudonyms) of firearms parts;

(2) Additional online social media postings that described the poster's exhortations to others to construct improvised explosive devices, such as pipe bombs;

(3) Additional online social media postings that outlined the poster's desire to prepare for and conduct violent attacks on racial minorities, religious minorities, and government officials, and the necessity of obtaining firearms and explosives for these purposes;

(4) Records of online purchases—likewise conducted from the defendant's residence—of items that included a 9mm handgun build kit and various burglary tools;

(5) Records from those online businesses confirming that those materials had in fact been delivered to the defendant's residence;

(6) Law enforcement officials' observations of the defendant's continued interest (post-felony conviction) in acquiring firearms, to include the defendant's travel to the firearms sections of at least three sporting goods stores in the months following his release from state prison,

and the defendant's statements (directed to an employee of one of those stores) that the defendant wanted to build a short-barreled rifle and acquire ammunition for that rifle.

The search of the defendant's residence uncovered (*inter alia*) the ammunition and destructive devices described and charged in the Indictment.  Specifically, law enforcement officers recovered a box containing twenty-five (25) rounds of 9mm handgun ammunition from the defendant's bedroom; a single round of 7.62x39mm ammunition; six (6) Molotov cocktail-type incendiary devices from the defendant's bedroom; and two (2) Molotov cocktail-type incendiary devices from a shed in the backyard of the defendant's residence.

The search also recovered materials consistent with the pre-search evidence of the defendant's activities described above.  Officers recovered, for example, a 3D printer in the defendant's bedroom, along with an attempt to complete a 3D-printed frame for a 9mm handgun; the 9mm handgun build kit purchased online and shipped to the defendant's residence; the burglary tools purchased online and shipped to the defendant's residence; and various and sundry items of Nazi regalia and other paraphernalia consistent with the violent ideology expressed in the online postings issuing from the defendant's residence.  Investigators also recovered a letter from the defendant to his aunt (the only other resident of the singe-family dwelling), drafted in May 2021 while the defendant was serving his state prison sentence, in which the defendant informed his aunt—as he prepared to complete his sentence and return to their shared Henrico residence—that "*It must be said that unless I am able to build guns, explosives, and other forms of weaponry & store them in my room without fear of the law finding out about it from you, I cannot fully trust in anything you say or do.*"

The defendant was arrested during the execution of the search warrant.  The defendant thereafter made incriminating post-Miranda statements on at least two occasions.   On November

13, 2022, after being read and subsequently waiving his *Miranda* rights, the defendant made the following admissions and statements, among others:

- Responding to an officer's question about what crime (the defendant) had been previously convicted of, the defendant stated "*felony vandalism.*"

- Responding to an FBI TFO's question about whether the devices found in his residence were "stable" (that is, whether the devices might suddenly explode as the searching investigators moved through the house), the defendant stated "*yes,*" and later expounded that "*obviously, the only way a Molotov cocktail works, it's not going to catch—it's obviously not going to explode, if anything it will, it won't even deflagrate. All it would do is just light on fire and stick to whatever you throw it at.*"

- When asked by the FBI TFO why he (the defendant) was "trying to get a firearm," the defendant responded that "*I feel that with the way that everything is going that… it's not going to be safe for me without one. That's all.*"

- Asked how long he (the defendant) "had [the devices] there," the defendant responded that he had had the devices "*longer*" than that summer, and "*longer*" than the previous Christmas—and in response to the FBI TFO's summation that the defendant had at least had the devices "for some amount of time," the defendant confirmed, "*yes.*"

- After the FBI TFO recited to the defendant one of the online postings referenced above, reading to the defendant "Have no tolerance for cops. If they come to your house, that's your cue to shoot them.  If you see cops at your white neighbor's house, that's also your cue to shoot them," the defendant responded, "*If you have the means.*"

On February 7, 2023, after being read and subsequently waiving his *Miranda* rights, the defendant made the following admissions and statements, among others:

- Acknowledging that he knew of the presence of (at least) the six Molotov cocktails found in his bedroom on November 13, 2022 (describing those devices as "*inert replicas*" that he possessed because he "*liked the history*" of the devices).

- When an FBI TFO noted that the devices were full of gasoline and polystyrene, the defendant did not deny the devices' contents, instead claiming that "*however, the thing is that substance is way too thick for it to be effective.*"

- After an FBI TFO countered the defendant's claim that the materials collected from his residence by law enforcement officers all had a "*benign purpose*" by noting the presence of bullets in the defendant's residence, the defendant responded "*however, only what, 25?*"

- The defendant subsequently responded to the FBI TFO's statement that "there is a fact, you had bullets," with the affirmative "*Mmm-hmm,*" and the claim that "*consider the fact that with prices of ammo and parts going up and down because of legislations and what not, perhaps maybe I just wanted to resell them, what have you.   For cash.*"

- The defendant later summarized the evidence that he understood law enforcement officers to have recovered as "*Alright so, all you have is the parts and the bullets.   And as far as anything else, what am I looking at . . . just the parts and bullets alone?*"

- The defendant later mused about the nature of the charges that he might face, telling the FBI TFO that "*however at the end of the day, it's like as far as the the fact that all you really have is the parts, maybe a few bullets, and really that's it, that limits the options for other charges.*"

The Molotov cocktail devices recovered from the defendant's residence were subsequently transported to the Federal Bureau of Investigation (FBI) Laboratory in Quantico, Virginia for examination. Forensic examination of those items established that (in short, as discussed further below): (1) the defendant's fingerprints were located on at least three of the Molotov cocktail devices; (2) the defendant's DNA was recovered from at least six of the Molotov cocktail devices; (3) the material contained within each of the Molotov cocktail devices consisted of gasoline and polystyrene (a type of Styrofoam); and (4) each of the eight Molotov cocktail devices were determined to be either fully assembled or partially assembled destructive devices (specifically, "Improvised Incendiary Devices" that had been constructed for extra "lethality" by the addition of polystyrene).

## II. Evidence & Witnesses

The United States plans to introduce the following evidence at trial.

### A. *Evidence Establishing the Defendant's Status as a Prohibited Person*

The United States will introduce a certified copy of the defendant's felony conviction in Henrico County Circuit Court (absent a stipulation from the defense) pursuant to Federal Rule of Evidence 803(8) (Public Records).

### B. *Evidence Pertaining to the Investigation Preceding the Search*

The United States will introduce evidence pertaining to the investigation that precipitated the search of the defendant's residence in November 2022 through the testimony of an FBI Special Agent involved in that investigation. The United States will further introduce a number of business records (absent stipulations, pursuant to Federal Rule of Evidence 902(11) certifications) related to the Internet Service Provider for the defendant's residence; various online businesses that received orders from (and shipped those products to) the defendant's residence; and social

media platforms utilized by the defendant through his residence's internet connection.

The statements made by the defendant in these various documents—that is, the defendant's online social media postings and the defendant's representations and instructions to the online vendors—are admissible against the defendant as admissions of a party opponent, and therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A). In addition, when the defendant's statements involve the defendant's communications with another person or entity, the government will introduce the statement(s) of the person with whom the defendant was speaking in order "to place [the defendant's] responses into context," *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003), and to make the defendant's statements "intelligible to the jury and recognizable as admissions," *id.* (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C. Cir. 1973)).

### C.  *Evidence Detailing Search of the Defendant's Residence & Defendant's Statements*

The United States will introduce evidence pertaining to the search of the defendant's residence on November 13, 2022, through the testimony of an FBI Special Agent and/or Task Force Officer, who will describe the nature and execution of the search in question, and the materials discovered during that search. Through this witness, the United States will introduce photographs taken during the search warrant execution, as well as various items collected from the defendant's residence (to include the ammunition and Molotov cocktail devices, as well as the aforementioned letter drafted by the defendant to his aunt.

The United States will introduce the defendant's statements through an FBI Task Force Officer (TFO) who interviewed the defendant on both of the occasions described above. The United States will introduce audio and video recordings of those interviews (as well as transcripts for the jury's convenience). As noted above, the defendant's statements—whether in the letter

drafted to his aunt; his social media postings; captured in audio/video recordings; or personally recounted by the TFO who was present during those utterances—are admissions of a party opponent and therefore excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2)(A). When that testimony relates to conversations with the defendant, the government may seek to introduce statements of the person with whom the defendant was speaking in order "to place [the defendant's] responses into context," *United States v. Wills*, 346 F.3d 476, 490 (4th Cir. 2003), and to make the defendant's statements "intelligible to the jury and recognizable as admissions," *id.* (quoting *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C. Cir. 1973)).

### D. Evidence Pertaining to the Ammunition Charged in Count One

The United States will further qualify a Special Agent of the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) as an expert in the field of ammunition origin. The United States anticipates that this ATF expert's testimony will establish the interstate and foreign commerce nexus of the two types of ammunition alleged in the Indictment—specifically, that the 9mm Hornady ammunition was manufactured in the State of Nebraska, and that the 7.62 round was manufactured at the Barnaul Cartridge Works factory in Russia; and as such, both sets of ammunition necessarily traveled in and affected interstate commerce in order to be present in the defendant's residence.

### E. Evidence Pertaining to Forensic Examination of Devices Charged in Count Two

The United States intends to qualify four FBI Laboratory examiners as experts in their respective fields, and to elicit testimony from each as regards their examination of the Molotov cocktails recovered from the defendant's residence. The United States anticipates that those experts will include (and will testify) as follows:

1. An FBI Forensic Examiner in the field of <u>Explosives Chemistry</u>, who will testify that the

materials contained in each of the eight (8) Molotov cocktail devices discovered in the defendant's residence included (1) gasoline and (2) polystyrene.

2. An FBI Forensic Examiner in the field of <u>Explosive Devices</u>, who will testify that each of the eight (8) Molotov cocktail devices recovered from the defendant's residence consisted of either a fully assembled or partially assembled "destructive device," specifically, "Improvised Incendiary Devices (IIDs), also commonly known as homemade firebombs or Molotov cocktails." The Forensic Examiner will also testify that "a material consistent with polystyrene was added to the ignitable liquid in each of the eight (8) IIDs, creating a homemade version of improvised napalm," and that "the consistency of napalm results in its tendency to adhere to exposed surfaces, increasing its lethality and destructive capability."

3. An FBI Forensic Examiner in the field of <u>Latent Fingerprints</u>, who will testify that fingerprints located on at least three (3) of the Molotov cocktail devices were consistent with the defendant's known fingerprints.

4. An FBI Forensic Examiner in the field of <u>DNA</u>, who will testify that an examination of DNA material recovered from six (6) of the Molotov cocktail devices discovered in the defendant's residence provided "Very Strong Support for Inclusion" with a DNA sample taken from the defendant, with a "Likelihood Ratio" between the defendant's known DNA sample and the DNA recovered from the devices ranging from $1.3 \times 10^6$ (1.3 million) to $1.6 \times 10^{29}$ (160 octillion).[1]

---

[1] The category "Very Strong Support of Inclusion" is the FBI Laboratory's highest-level category for confidence in the examination's conclusions. The FBI's "Likelihood Ratios" define the likelihood between the defendant being the contributor of the recovered DNA and any other unknown, unrelated person (for example, a Likelihood Ratio of $1.6 \times 10^{29}$ indicates that it is 160 octillion times more likely that the DNA analyzed during the examination was contributed by the provider of the known DNA comparison sample than by any other person).

### III. Essential Elements of Charged Offenses

#### A. *Count One – Possession of Ammunition by Convicted Felon*

To prove the charge of Possession of Ammunition by a Convicted Felon, in violation of 18 U.S.C. § 922(g)(1), the United States must prove the following elements beyond a reasonable doubt.

1. The defendant knowingly possessed the ammunition as charged;

2. At the time he possessed the ammunition, the defendant had been previously convicted of a crime punishable by imprisonment for a term exceeding one year;

3. The defendant knew that he was a felon; and

4. The ammunition possessed was transported in interstate or foreign commerce.

Title 18, United States Code, Section 922(g)(1); see also 2A O'Malley, Grenig and Lee, *Federal Jury Practice and Instructions*, Section 39.09 (6th ed., updated February 2024); 18 U.S.C.A. § 922; *Rehaif v. United States*, 139 S. Ct. 2191 (2019).

#### B. *Count Two – Possession of Destructive Device*

To prove the charge of Possession of a Destructive Device, in violation of 26 U.S.C. § 5861(d), the United States must prove the following elements beyond a reasonable doubt.

1. The defendant knew that he possessed the destructive device described in the Indictment;

    - Section § 5845(a) of Title 26 defines a "firearm" to include a "destructive device," which term is further defined at § 5845(f)(1) as any "any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket. . ."

10

2. The device was (1) an explosive and incendiary bomb and grenade (as defined at 21 U.S.C. § 5845(f)(1)), <u>or</u> (2) any combination of parts either designed or intended for use in converting any device into a destructive device and from which a destructive device could be readily assembled (21 U.S.C. § 5845(f)(3)).

    - Every circuit to have addressed the topic of Molotov cocktails has addressed the classification of Molotov cocktails as covered "destructive devices" under § 5845.  *See*, *e.g.*, *United States v. Simmons*, 83 F.3d 686, 688 (4th Cir. 1996) (holding that a fully assembled Molotov cocktail constituted an incendiary bomb or similar device under § 5845(f) regardless of whether a defendant had a lighter or match with which to ignite the device).

3. The defendant understood that the device was an explosive and incendiary grenade;

    - The United States is not required to establish the defendant's intent as regards the destructive devices if fully constructed (per § 5845(f)(1))—the inquiry is into whether the defendant understood the nature of the devices in his possession.  *See United States v. Thomas*, 111 F.3d 426 (6th Cir. 1997), citing *United States v. Morningstar*, 456 F.2d 278, 280 (4th Cir. 1972) (defendant's purported use of blowing tree stumps did not preclude determination that exploding shotgun shells were "bombs" under § 5845(f) as such devices, lacking social utility, are regulated items regardless of their intended use); *United States v. Copus*, 93 F.3d 269 (7th Cir. 1996) (the objective design characteristics of homemade detonators permitted a finding the detonators were bombs designed as weapons, regardless of defendant's claim he planned to use them to blow stumps).

- As to the "combination of parts" prong of § 5845(f)—that is, § 5845(f)(3)—the United States is required to prove that the defendant knew that the parts in the defendant's possession were capable of being assembled into a destructive device, and that he intended to do so. *Morningstar*, 456 F.2d at 280.

4. The device was not registered to the defendant in the National Firearms Registration and Transfer Record.

    - The United States does not need to establish that the defendant knew the device(s) in his possession were required to be registered, or knew that the devices were not in fact registered (*United States v. Freed*, 401 U.S. 601 (1971)).

Title 26, United State Code, Sections 5845(f) and 5861(d).

## IV.   Res Gestae & Rule 404(b) Evidence

### A. *Res Gestae Evidence*

Evidence of uncharged conduct is not "other crimes" evidence subject to Federal Rule of Evidence 404 if the uncharged conduct "arose out of the same series of transactions as the charged offense, or if evidence of the uncharged conduct is necessary to complete the story of the crime on trial." *United States v. Siegel*, 536 F.3d 306, 316 (4th Cir. 2008). Evidence of bad acts that "provide context relevant to the criminal charges"—res gestae evidence—is admissible without considering the requirements of Rule 404. *United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007). As the court in *United States v. Masters* explained:

> "One of the accepted bases for the admissibility of evidence of other crimes arises when such evidence 'furnishes part of the context of the crime' or is necessary to a 'full presentation' of the case, or is so intimately connected with and explanatory of the crime charges against the defendant and is so much a part of the setting of the case and its 'environment' that its proof is appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the res gestae' or the

12

> 'uncharged offense is so linked together in point of time and circumstances with the crime charged that one cannot be fully shown without proving the other ...' (and is thus) part of the res gestae of the crime charged."

622 F.2d 83, 86 (4th Cir. 1980) (internal citations omitted).

Here, the United States intends to introduce evidence of the defendant's online statements (via his social media account) and his online purchases (of firearm components, e.g.), because the defendant's online actions are inextricably linked to the charges alleged in the Indictment. Law enforcement officers' discovery of the defendant's online activity spurred—necessitated—the decision to obtain a search warrant for the defendant's residence, and to conduct the search that recovered the destructive devices and ammunition alleged in Counts One and Two. The jury will naturally and inevitably want to understand the basic circumstances of offenses charged—to include such elemental questions as, e.g., why law enforcement officers were present in the defendant's residence on November 13, 2022. *See Masters*, 622 F.2d at 86 ("'(t)he jury is entitled to know the 'setting' of a case. It cannot be expected to make its decision in a void without knowledge of the time, place and circumstances of the acts which form the basis of the charge.") (quoting *United States v. Roberts,* (6th Cir. 1977) 548 F.2d 665, 667).

The defendant's online activity further furnishes "part of the context of the [offenses alleged]" because the defendant's actions and statements are necessary to demonstrate to the jury (*inter alia*) the defendant's motive for possessing 9mm handgun ammunition (because he had just purchased a 9mm handgun build kit; because he needed firearms and ammunition to carry out the militant activities he described in his online postings); and the defendant's motive for constructing and possessing improvised incendiary devices (because the construction and employment of improvised explosive devices were a part of the militant strategy the defendant urged online). *See*, *e.g.*, *United States v. Frazier*, 418 F.2d 854, 854 (4th Cir. 1969) (in a trial for kidnapping, the

13

admission of evidence of an uncharged armed robbery by the defendant because it was relevant to proving the defendant's motive for the kidnapping, and was thus "part of the res gestae of the crime on trial"). The question of whether the defendant intended to construct destructive devices is a matter before the jury, and the United States is entitled to present evidence—specifically, the defendant's own descriptions of his desires, plans, and intentions—to prove its case-in-chief.

### B. *Rule 404(b)*

Even were the evidence of the defendant's online activity and statements *not* intrinsic to the charged offenses, that same evidence remains alternatively and independently admissible under Federal Rule of Evidence 404(b).

Federal Rule of Evidence 402 establishes the background principle that relevant evidence is admissible unless barred by a specific provision of federal law. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Federal Rule of Evidence 404(b) establishes a limited exception to the general rule that relevant evidence is admissible by providing that evidence of a defendant's crimes, wrongs, or other acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). However, Rule 404(b)'s prohibition is strictly proscribed to evidence offered to prove character. Evidence of a crime, wrong, or other act that is offered for *any other purpose* other than proving character may be admitted. Fed. R. Evid. 404(b)(2). Those other purposes include proving "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

Notably, Rule 404(b) is a rule of inclusion, and the list of permissible purposes for the evidence enunciated in the rule is instructive, not exhaustive. *United States v. Queen*, 132 F.3d

14

991, 994-95 (4th Cir. 1997), *cert. denied*, 118 S. Ct. 1572 (1998). Indeed, the reasons supporting use of 404(b) evidence aside from those explicitly listed in the rule are "infinite" in number. *Masters*, 622 F.2d at 86.

In the instant case, evidence of the defendant's online communications is relevant for a host of permissible purposes—some of which the United States notes below. First, the defendant's statements regarding his knowledge of how to construct untraceable firearms, his preference for certain types of ammunition for firearms, his discussion of the construction of improvised explosive devices, and his plans for the use of such firearms, ammunition, and explosives establish that the defendant had a clear and evident motive for possessing the ammunition and incendiary devices found within his residence. Second, those same communications establish the defendant's intent – that his possession of those materials was knowing and deliberate. Third, those online communications are relevant to establish the defendant's knowledge, and to rebut any potential proffered defense of mistake or accident—the defendant's online communications demonstrate that his possession of the incendiary devices, to cite one example, was not the byproduct of confusion or ignorance about the devices' nature. Fourth, the online communications demonstrate the defendant's plan; that is, they demonstrate to the jury the larger context of the defendant's possession of the ammunition and explosives, adding further weight to the evidence establishing the defendant's knowing and deliberate control over the materials charged in the Indictment.

The defendant's online activities—specifically, his purchase of various items that include a 9mm handgun build kit and various burglary-type tools—are clearly relevant for many of the same reasons noted above. For example, the defendant's purchase of a 9mm handgun kit establishes the defendant's motive and intent for possessing for possessing ammunition; his

15

knowledge of the characteristics of that ammunition (both kit and the charged ammunition are 9mm caliber); and his plan and purpose for that ammunition. The defendant's online purchase of burglary tools, to cite only one such permissible purpose, establishes his identity—that is, the fact that the defendant's online purchases were found within his bedroom demonstrates the defendant's use of the IP address utilized to purchase those items, and links the defendant to the other online communications noted above (which are themselves part of the overall context of the crimes charged in the Indictment).

Evidence of the defendant's online communications and purchases is thus highly probative of the charged offenses and admissible against the defendant. It is also not unfairly prejudicial. Where such evidence is *relevant*, the Fourth Circuit has "found the admission of [even] gruesome and shocking [evidence, *i.e.*,] photographs not to be unfairly prejudicial." *United States v. Bullis*, 139 F.3d at 893 (4th Cir. 1998) (collecting cases). Evidence that is damaging to a defendant's case is not, for that reason alone, unfairly prejudicial; "[i]ndeed, evidence that is highly probative invariably will be prejudicial to the defense." *Id.* (brackets and internal quotation marks omitted). Where, as here, evidence is prejudicial only in the sense of tending to show the defendant's guilt, it is not unfairly prejudicial, let alone so unfairly prejudicial that it should be excluded despite its high probative value. *See* Fed. R. Evid. 403 (authorizing the exclusion of relevant evidence only "if its probative value is substantially outweighed by a danger" of, *inter alia*, unfair prejudice).

Further, exclusion, rather than inclusion, of this highly probative evidence is unhelpful to the jury. The jury is entitled to know the full story of the defendant's actions, rather than sanitized snippets that omit important details and context. "[B]eyond the power of conventional evidence to support allegations and give life to the moral underpinnings of law's claims, there lies the need for evidence in all its particularity to satisfy the jurors' expectations about what proper proof

16

should be." *Old Chief v. United States*, 519 U.S. 172, 188 (1997). The evidence in question is as essential to the story of the case as it is to the elements of the charged offenses. It poses no risk of unfair prejudice, let alone any risk that outweighs its high probative value.

## **CONCLUSION**

The United States estimates that the presentation of the United States case-in-chief, as outlined above, will entail two days of trial.

Respectfully submitted,

JESSICA D. ABER
UNITED STATES ATTORNEY

By: _____/s/_____
Thomas A. Garnett
VSB Bar No. 86054
Peter S. Duffey
VSB Bar No. 39477
Assistant United States Attorneys
United States Attorney's Office
919 East Main St., Suite 1900
Richmond, VA 23219
Phone: (804) 819-5400
Fax: (804) 771-2316
Thomas.A.Garnett@usdoj.gov